# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVE WILLIAMS and REBA WILLIAMS, <br>     Plaintiffs and Counter Defendants, <br><br>     v. <br><br> RANDALL BEAN, ELIZABETH BLACK <br> BEAN, et al., <br>     Defendants and Counter Claimants. | No. 16-cv-1633 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS COUNTERCLAIMS AND MOTION TO SEAL

Dave Williams and Reba Williams (collectively, "Plaintiffs," "Counter Defendants" or "Williamses") brought this action against Randall Bean, Elizabeth Black, Christopher Bean, and Matthew Bean (collectively, "Defendants," "Counter Claimants," or "Beans") in the Connecticut Superior Court for the Judicial District of New London. ECF No. 1-2. The Beans removed this case to this Court. ECF No. 1. The Beans then filed Counterclaims against the Williamses. ECF No. 26. The Williamses filed a motion to dismiss the Counterclaims. ECF No. 30. Defendants then filed Amended Counterclaims. ECF No. 41. The Court agreed to consider the original motion to dismiss, ECF No. 30, as applying to the Amended Counterclaims, and allowed the parties to file supplemental briefing as to the new allegations in the Amended Counterclaims. ECF No. 49; ECF No. 50. The Williamses then filed a supplemental motion to dismiss as to the new allegations in the Amended Counterclaims. ECF No. 57.

As the parties briefed the motion to dismiss as to the Counterclaims and the Amended Counterclaims, the parties indicated that the Williamses would be requesting that Ms. Williams's deposition transcript and all exhibits to that deposition be designated Confidential under the

Court's Standing Protective Order, ECF No. 11, and that the parties would, therefore, be filing documents under seal pending the resolution of a dispute over whether the documents should, in fact, be sealed. *See, e.g.*, 4/7/2017 Motion to Seal at 1-2, ECF No. 39 ("Defendants object to Plaintiffs' designation of the entire transcript of Reba Williams' deposition and all exhibits thereto being designated Confidential . . . Defendants assume that the designations of the deposition transcript and exhibits were made because Plaintiffs believe they implicate a legitimate expectation of privacy. Defendants disagree . . . Defendants plan to meet and confer with counsel for Plaintiffs regarding this matter, and then seek relief from the Court if such meet and confer does not yield positive results."). On July 24, 2017, the Court provisionally granted the most recent motion to seal pending the resolution of the underlying dispute over whether Ms. Williams's deposition and the attached exhibits should be sealed. ECF No. 64.

For the reasons that follow, the Court here **GRANTS** in part and **DENIES** in part the Williams' Motion to Dismiss the Beans' Counterclaims.

As explained below, the Court **ORDERS** that all documents must be unsealed.

## I.     FACTUAL ALLEGATIONS[1]

This matter is a dispute between neighbors. The Williamses allegedly reside in Greenwich, Connecticut. Amend. Countercl. ¶ 14, ECF No. 40. The Beans allegedly reside in Boston, Massachusetts. *Id.* ¶ 13. Matthew Bean and Christopher Bean are the adult children of Mr. Bean and Ms. Black. *Id.* ¶¶ 20-21.

On October of 2014, Mr. Bean and Ms. Black allegedly purchased a home at 28 Water Street in Stonington, Connecticut (the "Bean Property"). Amend. Countercl. ¶ 22. The house on

---

[1] The Court includes only factual allegations that are relevant to the motion to dismiss the Counterclaims and the Amended Counterclaims in this section.

the Bean Property was built around 1870 and in need of repair at the time. *Id.* The Bean Property allegedly had, as a defining characteristic, uninterrupted views of Montauk Point, Fishers Island, and the Fishers Island Sound ("Water Views"). *Id.* ¶ 23. The Beans allegedly purchased the Bean Property primarily because of the Water Views and the property's waterfront location. *Id.* ¶ 24. The Beans allege that they began moving into the Bean Property on June 5, 2016. *Id.* ¶ 77.

The Williamses allegedly own two houses in Stonington that immediately surround the Bean Property (collectively, the "Williams Properties"). Amend. Countercl. ¶ 48. One house, located at 24 Water Street, is immediately next door to the Bean Property ("24 Water Street"). *Id.* ¶ 49. The second house, located at 29 Water Street, is located directly across the street from the Bean Property ("29 Water Street"). *Id.* One of the Williams Properties has a dock. *Id.* ¶ 42.

Defendants allege that the Williamses "have a history of antagonistic relations with the Stonington community as detailed in an article published by the New London Day in March 2011." Amend. Countercl. ¶ 50. Defendants further allege that the Williamses filed two separate lawsuits in or around 2009 against the previous owners of the Bean Property, alleging a property line dispute. *Id.* ¶¶ 51–52. The Beans allege that the previous owners of the Bean Property sold them the property "well below their initial asking price, in part, because of the Williams' harassing actions." *Id.* ¶ 53.

A.    **Design Plan and Stonington Planning and Zoning Commission**

Before the Beans purchased the Bean Property, they allegedly met with an architect to determine what renovations they could make to the existing house under the Town of Stonington Planning and Zoning Commission ("Stonington P&Z") Guidelines. Amend. Countercl. ¶ 25. An experienced architect allegedly assisted them in developing a renovation design (the "Design Plan") that included installing predominantly south and southwest-facing windows to "take

advantage of south facing solar gain, the natural light, and the Water Views." *Id.* ¶ 26. The

Design Plan allegedly placed as few windows as feasible on the north side of the home because

of the absence of any solar gain or natural light from that direction. *Id.* ¶ 27. Overall, the Design

Plan allegedly added windows and changed the usage of certain spaces, but did not change the

footprint or height of the existing house on the Bean Property. *Id.* ¶ 28.

Before submitting the Design Plan to the Stonington P&Z, the Beans allege that they

asked the real estate agents for the Bean Property to inquire as to whether the Williamses, as the

owner of the properties next door and across the street from the Bean Property, had any

objections. *Id.* ¶ 29. The real estate agent allegedly reported that the Williamses did not object to

the Design Plan. *Id.* ¶ 30.

On March of 2015, the Beans allegedly worked with the Stonington P&Z officer to

submit their design plan for approval. *Id.* ¶ 31. Many in the Stonington community allegedly

supported the plan, with around 50 neighbors either sending letters of support to Stonington P&Z

or planning to attend the plan review hearing in support. *Id.* ¶ 32. Two households allegedly

objected to the Design Plan. *Id.* ¶ 33. The Williamses were, allegedly, not among these objectors.

*Id.* The Stonington P&Z allegedly approved of the Design Plan unanimously. *Id.* ¶ 35.

Following the Stonington P&Z's approval of the Design Plan for the Bean Property, the

individuals who had allegedly opposed the Design Plan, Martina Durner and Larry Alstiel and

Paul Koushouris (collectively, the "Design Plan Objectors"), allegedly filed two lawsuits against

"the Town of Stonington, Stonington Planning & Zoning, Stonington Zoning Board of Appeals,

and the Bean Family." *Id.* ¶ 36. Ms. Durner and Mr. Alstiel allegedly contacted multiple

neighbors, including the Williamses, in an effort to build support for Ms. Durner and Mr.

Alstiel's lawsuit. *Id.* ¶ 37.

In November of 2015, the Beans allegedly agreed to a stipulated settlement with the Design Plan Objectors that the Beans, moving forward, would not make changes to the Design Plan for a period of ten years. *Id.* ¶ 38. The Williamses allegedly named Ms. Durner and Mr. Alstiel as principal witnesses in the matter currently pending before the Court. *Id.* ¶ 39.

**B.      Dock Permit**

In or around August of 2015, the Beans allegedly filed an application for a dock permit to build a short dock on the Bean Property. *Id.* ¶ 41. They allegedly sent notifications to their immediate neighbors, including the Williamses. *Id.* Mr. Williams allegedly opposed the Defendants' dock permit application. *Id.* ¶ 42. The opposition letter from the Williamses allegedly stated, in relevant part, that "[w]hen we brought our home, 24 Water Street, six years ago, we were informed that no more docks would be permitted in the Commons to the Point area." *Id.* ¶ 43. The Stonington Harbor Marine Commission allegedly approved the Beans' dock permit application unanimously, with a 10-0 vote, roughly one month later. *Id.* ¶ 44.

The Beans allegedly proceeded to make a necessary dock permit application to the State of Connecticut Department of Energy and Environmental Protection ("DEEP"). Amend. Countercl. ¶ 45. On February 29, 2016, DEEP allegedly granted tentative approval for the dock permit for the Bean Property. *Id.* The Beans allege that, around the time of DEEP's February 29, 2016, tentative approval for their dock permit application, the Williamses began to harass them. *Id.* ¶ 47. On March 28, 2016, DEEP allegedly gave formal approval for the dock permit, and the Beans began preparing to construct the dock. *Id.* ¶ 68. The Williamses allegedly appealed the decision to DEEP, which allegedly denied their appeal. *Id.* ¶ 69.

### C. Allegedly Harassing Activities by Mr. Williams and Ms. Williams

#### 1. Correspondence with Individuals

On August 31, 2015, Ms. Williams allegedly sent an e-mail to a neighbor Lynn Young that read, in part, "Mr. Bean plans to build high enough to see over our hedge. If he does and peers into our privacy, we'll know he's a peeping tom." Amend. Countercl. ¶ 34.

On February 9, 2016, Ms. Williams allegedly sent an e-mail to another neighbor, stating that the renovated Bean Property "ruin[ed] the look of Water Street," and called Mr. Bean a "barbarian." Amend. Countercl. ¶ 40.

On March 4, 2016, Ms. Williams allegedly sent another e-mail to someone named "Josie," stating in relevant part that Mr. Bean "told the world he'd build to see into our yard and he's done it." Amend. Countercl. ¶ 55 n. 3.

In or around March 6, 2016, Mr. Williams allegedly sent an e-mail to neighbor Betty Richards that read, in relevant part: "Reba wants me to send this on. For her, the dock does it. Can't live with that and all else next door. We'll have to move." Amend. Countercl. ¶ 46.

Ms. Williams allegedly also sent an e-mail to Mr. Alstiel on March 7, 2016, stating that Mr. Bean "had said he planned to build so high he could see over our hedge into our garden." Amend. Countercl. ¶ 59.

On April 5, 2016, Ms. Williams allegedly sent an e-mail to neighbor Spike Lobdell, which stated that "Mr. Bean was telling people how he was going to build a tall place which would overlook ours, including our garden – ruining our privacy. He did what he said he would." Amend. Countercl. ¶ 70 n. 4.

On July 18, 2016, Ms. Williams allegedly sent an e-mail to neighbor Annette Blaugrund, stating that Mr. Williams and Ms. Williams "were being 'spied upon' by the Bean Family." Amend. Countercl. ¶ 85.

On July 20, 2016, Mr. Williams allegedly sent identical e-mails to five neighbors, Tom Hausman, Al Razzano, Heidi Reavis, Betty Richards and Mary Fitzgibbons. Amend. Countercl. ¶ 86. This e-mail allegedly stated that "the Beans were snooping on the Williams" and further stated that "last week a young man from next door began taking photographs of us in our garden." *Id.*

On October 20, 2016, Ms. Williams allegedly sent an e-mail to Ms. Young, stating that "'just like [previous owner of the Bean Property] Hobbs,' the Bean Family 'won't stop.'" Amend. Countercl. ¶ 107. This e-mail allegedly went on to accuse one Defendant of "staring at Ms. Williams" and further stated that the Williamses only sued the Beans "because the Beans refused twice to agree to stay out of our property." *Id.* The Beans allege that the allegations about them in this e-mail are false. *Id.* ¶ 108. The Beans further allege that these accusations are likely to harm their reputations and damage them in their professional endeavors. *Id.* ¶ 109. The Beans further allege that these accusations are likely to harm Christopher Beans's reputation and damage him in his nascent professional endeavors. *Id.* ¶ 110.

### 2. Correspondence with Multiple Recipients

### a. The March 4, 2016 E-mail to Multiple Stonington Residents

On March 4, 2016, at a time when the Beans allege that they had yet to meet the Williamses, the Beans allege that they learned that the Williamses had circulated a disparaging e-mail about them to numerous residents of Stonington. Amend Countercl. ¶¶ 54-55. In this e-mail, the Williamses allegedly accused the Beans of stating they were "friends" with Mr. Williams and

Ms. Williams. *Id.* ¶ 55. This e-mail further alleged that Mr. Bean and Ms. Black told an

unidentified third party that they had designed the Bean Property "so that they could look into

the Williams' garden." *Id.*

On March 5, 2016, Ms. Black allegedly responded to this e-mail by sending Mr. Williams

an e-mail that stated, in relevant part, that "we have never indicated in writing or conversation

that we are 'friends with you or your wife," and that "we have never, in writing or conversation,

indicated that the reason for this purchase was so that we could look at your gardens," and "I can

assure you that we have absolutely no intention of interfering with your privacy and look

forward to being cordial and respectful neighbors." Amend. Countercl. ¶ 57.

Ms. Williams allegedly responded to Ms. Black's e-mail with a March 7, 2016, e-mail to

neighbor Ms. Richards, stating that, just as in prior years when they had been "made miserable"

by the previous owner of the Bean Property, whom Ms. Williams referred to as "Horrible

Hobbs," it was happening again. Amend. Countercl. ¶ 58. Ms. Williams's e-mail allegedly said

that Ms. Black's was "lying" in Ms. Black's March 5, 2016, e-mail. *Id.*

Ms. Williams allegedly responded to Ms. Black's March 5, 2016, e-mail in March 7,

2016, e-mail stating, in relevant part:

> I have no interest in the past.  All that I care about is recent behavior of your
> husband. You imply that I have misstated facts about him.  I have *huge* amounts
> of backup from people who detest you both. Should I have to go to court for
> anything -- they have all offered support. At one time I thought you were
> innocent, and didn't know anything about your husband's behavior. I now know
> better.

Amend. Countercl. ¶ 60 (emphasis in original). The Beans allege that they have no knowledge of

what "behavior" Ms. Williams was referring to and the Beans alleged that they were "baffled and

alarmed." *Id.* ¶¶ 61–62. Mr. Bean allegedly contacted the Stonington Police Department to

express his concerns about Ms. Williams's e-mail.

On March 8, 2016, Mr. Bean allegedly sent an e-mail to both the Williamses, explaining, among other things, that "I want to make abundantly clear that at no stage did we ever make any comments with regard to you, nor would we have any reason to," and that "[w]e hope to be cordial neighbors." Countercl. ¶ 64. Mr. Bean allegedly invited the Williamses to ask any questions about the renovation plans at the Bean Property and further invited the Williamses for drinks. *Id.* The e-mail emphasized that the Beans "possess only goodwill with regard to you, and a "hope that you will come to feel the same way." *Id.*

Roughly an hour later on March 8, 2006, Ms. Williams allegedly responded with an e-mail stating that:

> As a consequence of your constantly forcing yourself in our lives we are leaving Stonington. We do not want to live next door to you. Do not contact us again. You will always be the person who has forced me away from a house and garden I love.

Amend. Countercl. ¶ 65.

### b. E-mails to the "Private Lives" E-mail List

On March 14, 2016, Ms. Williams allegedly sent an e-mail to an e-mail group called "Private Lives." Amend. Countercl. ¶ 67. This e-mail allegedly accused Mr. Bean of improperly obtaining approval for renovations to the Bean Property, and further allegedly that the renovations were "out-of-code." *Id.*

On May 26, 2016, Ms. Williams allegedly sent another e-mail to "Private Lives," stating that "Mr. Bean had said that '[t]his house under renovation is going to be so tall I will be able to look right into the Williams' garden.'" Amend. Countercl. ¶ 74. She allegedly further stated that "[t]he renovations to the Bean Property were 'designed for spying' on the Williams, and again suggested that the members of the Bean Family are peeping toms." *Id.* Neighbor Susan Kinsolving allegedly responded to Ms. Williams's May 26, 2016, e-mail, writing that the

Williamses should "shin[e] very bright lights back at them [which] might force them to lower blinds and pull curtains." *Id.* ¶ 75. Ms. Williams allegedly responded: "[W]e'll have to figure out how to do it." *Id.*

On June 3, 2016, Ms. Williams allegedly sent another e-mail to "Private Lives." *Id.* ¶ 76. The Beans allege that, at this time, they had yet to move into the Bean Property. *Id.* Ms. Williams's e-mail allegedly stated that "'several people' were 'staring' and 'looking at us' from the Bean Property."

On September 12, 2016, Mr. Williams allegedly sent an e-mail to "Private Lives." *Id.* ¶ 98. This e-mail allegedly informed recipients that the Williamses had filed suit against the Beans to "prevent their eavesdropping, spying, and photographing us and our guests while we are in our property," and it allegedly noted that Williamses had sued the previous owners of the Bean Property. *Id.* Defendants allege that this e-mail contained statements concerning them that were false. *Id.* ¶ 99.

### c.    The April 5, 2016 Letter

On April 5, 2016, the Williamses allegedly sent a letter to several other people in Stonington that "disparaged the Bean Family's home," "suggested that the Bean Family were 'peeping toms'" and claimed that Mr. Bean had said that "the Bean Property had been specifically designed to see into the Williams' yard." Amend. Countercl. ¶ 70. The Beans allege that they only learned about this letter after this case was first filed. *Id.* ¶ 71.

### d. The October 5, 2017 Letter

On October 6, 2016, the Williamses allegedly sent a letter to several other people in Stonington (the "October 2016 Letter").[2] Amend. Countercl. ¶¶ 100-01. This letter allegedly contained "additional disparaging statements about the Bean Family." *Id.* ¶ 102. It allegedly contained statements about the Beans that are false. *Id.* ¶ 103.

The Beans allege that the October 2016 Letter contained false statements that are injurious, "particularly to Christopher Bean who is in the process of launching his career." Amend. Countercl. ¶ 104. Specifically, this letter allegedly falsely claimed that Christopher had trespassed on the Williams Properties and again described the Defendants as "peeping toms." *Id.* ¶ 105.

The October 2016 Letter allegedly stated that the Williamses had filed this lawsuit and that they "expect[ed] the trial to attract the press, permanently damaging" Christopher Bean. Amend. Countercl. ¶ 106.

### 3. Other Acts

In April 2016, the Beans allegedly learned that Mr. Williams had requested a copy of the Bean Property Design Plan from the Stonington P&Z. Amend. Countercl. ¶ 72. In light of this and Ms. Williams' earlier reference to being willing to go to court, id. ¶ 60, Mr. Bean and Ms. Black allegedly instructed the contractors working on the Bean Property "to be extremely sensitive to the Williamses and the Williams Properties." *Id.* ¶ 73.

The Beans allege that they first moved into the Bean Property for the summer on June 5, 2016. Amend. Countercl. ¶ 77. The Beans allege that, on this date, while they were moving their

---

[2] The Beans allege that Ms. Williams sent an October 4, 2016 e-mail to "Private Lives" that was identical to the October 2016 Letter, except for the added signature, "Fondly, Reba." Amend. Countercl. ¶ 100 n. 5.

belongings, "Ms. Williams stood at the side entrance of her property," "very close" to the Bean Property, "holding an iPad or other digital recording device and point[ing] and gestur[ing] wildly." *Id.* ¶ 78. Mr. Williams allegedly stood next to her. *Id.* Allegedly, neither Ms. Williams nor Mr. Williams spoke directly to Mr. Bean or Ms. Black. *Id.* The Beans allege that "this was intended to cause Mr. Bean and Ms. Black to turn and look in her direction." *Id.*

Several days later, Mr. Williams allegedly "stood directly in front of the Bean Property on the sidewalk, obstructing the entrance to the Bean Property from the street." Amend. Countercl. 79. The Beans allege that "this action was designed to provoke a response form Mr. Bean or Ms. Black." *Id.*

The Beans allege that, following these incidents, the Williamses "have continued to harass" the Beans when they visit the Bean Property. Amend. Countercl. ¶ 80. Specifically, the Beans allege that, on over ten occasions throughout the summer of 2016, "the Williams[es] have positioned themselves close to the Bean Property, making inflammatory gestures, or stood directly in front of the Bean Property." *Id.* ¶ 81. The Beans allege that they felt "intimidated, threatened and bullied by the Williams' pattern of behavior," that these actions have "made the Bean Family uncomfortable moving about their own home when the Williams are in Stonington," and that the Beans are "reluctant to go outside when the Williams are in Stonington and avoid inviting friends and family to visit for fear that they will be subjected to the Williams' harassment." *Id.* ¶¶ 82-84.

### 4.    "The Wall of Trees"

The Williamses have allegedly planted a row of high trees designed to eliminate the Water Views of the Bean Property. Amend. Countercl. ¶ 87. Before Mr. Bean and Ms. Black

purchased the Bean Property, the Williams Properties were already allegedly protected by a roughly six-foot tall mature hedge. *Id.* ¶ 88.

On April of 2016, someone who represented themselves as being employed as a gardener by the Williamses allegedly telephoned Mr. Bean at his office and "advised him that the Williams[es] intended to plant even taller trees along the parties' shared property line." Amend. Countercl. ¶ 89. In May 2016, the Williamses allegedly planted four large trees along the shared property line, behind the existing hedge. *Id.* ¶ 90. The Beans allege that these trees violate Stonington P&Z guidelines. *Id.* ¶ 91.

In June 2016, a person who allegedly represented themselves as being employed as a gardener by the Williamses allegedly again contacted the Beans, and advised them that the Williamses planned to plant additional, taller trees along the property line. Amend. Countercl. ¶ 92. The previous four trees were allegedly then removed. *Id.* ¶ 93. On July 20, 2016, those trees were allegedly replaced by thirty taller trees, each approximately fourteen feet tall, along the boundary between the Williams Property and the Bean Property (the "Tree Wall"). *Id.* The Beans allege that the Tree Wall also violate Stonington P&Z guidelines. *Id.* ¶ 94. The Beans further allege that these trees block large portions of the Bean Property's Water Views. *Id.* 95.

The Beans allege that the current trees are of a species that will likely grow to thirty feet or more. Amend. Countercl. ¶ 96. The Beans allege that, if the trees attain this height, they would be sufficient "to eliminate the Bean Family's ability to enjoy the Water View[s] from any floor of the Bean Property." *Id.* ¶ 96. Defendants further allege that the Tree Wall "deprive[s] the Bean Family of their enjoyment of their Property and has impacted the Bean Property's value and marketability." *Id.*

## II.    STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (internal citations omitted). When deciding a Rule 12(b)(6) motion to dismiss, a court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion [s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555-57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and  . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

## III.    DISCUSSION

The Bean Family raises eight claims for relief under Connecticut law. Count One brings a claim for abuse of process against the Williamses. Amend. Countercl.[3] ¶¶ 111–16. Count Two brings a claim for invasion of privacy against the Williamses. *Id.* ¶¶ 117–20. Count Three brings a claim for defamation against Williamses as to their various alleged communications. *Id.* ¶¶ 121-25. Count Four brings a claim of absolute private nuisance against the Williamses. *Id.* ¶¶ 126-31. Count Five brings a claim of negligent private nuisance against the Williamses. *Id.* ¶¶ 132-36. Count Six alleges that the Williamses are in violation of Conn. Gen. Stat. § 52–570 through the planting of the Tree Wall. *Id.* ¶¶ 137–42. Count Seven alleges that the Williamses are in violation of Conn. Gen. Stat. § 52–480, which provides for potential injunctive relief requiring the removal of the Tree Wall. *Id.* ¶¶ 143–49. Count Eight brings a claim for private enforcement of Stonington Borough zoning regulations that allegedly prohibit the Tree Wall against the Williamses.  *Id.* ¶¶ 150–65.

For the following reasons, the Court grants in part and denies in part the motion to dismiss. The Court grants the motion to dismiss Count One in its entirety and Count Five and Count Six as to Christopher and Matthew Bean. The Court otherwise denies the motion to dismiss Count Two through and including Count Eight.

### A.    Abuse of Process

The Williamses argue that the Beans' counterclaim for abuse of process is premature absent disposition of the underlying litigation. Pls.' Br. 5. The Beans argue that prior resolution of the underlying litigation is not an element of abuse of process at common law. Defs.' Resp. 4–5. The Court agrees with the Williamses. The Williams' motion to dismiss the claim is granted.

---

[3] Each Count incorporates the preceding paragraphs in the Beans' Counterclaims.

Under Connecticut law, "[a]n action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed." *Passaro-Henry v. Allstate Ins. Co.*, No. 3:10-CV-450 JCH, 2010 WL 5174405, at *3 (D. Conn. Dec. 15, 2010) (quoting *Larobina v. McDonald,* 274 Conn. 394, 403 (2005)); *Rogan v. Rungee*, 165 Conn. App. 209, 220 (2016). Central to an action for abuse of process is the use of legal process "against another [party] *primarily* to accomplish a purpose for which it is not designed. Abuse of process requires conduct (1) occurring after the issuance of process and (2) intended *primarily* to accomplish a purpose for which the process is not designed." *Passaro-Henry*, 2010 WL 5174405, at *3 (internal citations omitted and quotation marks omitted); *see also Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 114 (2d Cir. 1996) ("[L]iability for abuse of process lies only when the offending party overtly misuses the process once the proceeding has begun.").

"Although abuse of process claims do not include favorable termination as an essential element, the cause of action is still considered premature until the underlying litigation has been completed." *MacDermid v. Leonetti*, 158 Conn. App. 176, 184 (2015) (citing *Larobina v. McDonald*, 274 Conn. 394, 407–08 (2005)).

The Williamses brought suit against the Beans in the Connecticut Superior Court for the Judicial District of New London. ECF No. 1-2. The Beans removed this case to this Court, EDF No. 1, and subsequently brought Counterclaims against the Williamses. ECF No. 26. The Beans moved the Court to dismiss the Williamses Counterclaims, ECF No. 30, which brings us to the current moment. The Beans' "cause of action is . . . premature until the underlying litigation has been completed," and must be dismissed. *MacDermid*, 158 Conn. App. at 184 (2015).

The Beans' attempt to distinguish *Larobina* is misplaced. In *Larobina*, plaintiff brought suit against a bank for breach of contract, negligence, defamation and a number of other claims sounding in federal and state law. *Larobina*, 274 Conn. at 396–97. While the first matter was pending in Superior Court, plaintiff brought a second action against the bank and the attorneys defending the bank in the underlying lawsuit alleging, among other claims, abuse of process. *Id.* at 397. While the court recognized that success in the first action was not a prerequisite for a claim of abuse of process, the court noted that "the eventual outcome of that action and the evidence presented by the parties therein would be relevant in litigating an abuse of process claim." *Id.* at 407. When plaintiff brought the second action, he had not yet established that the bank was not legally entitled to the money that plaintiff claims the defendants were attempting to extort from him by their allegedly oppressive litigation tactics, or that the bank had "no good-faith reason to believe that it [was] entitled to the money," which were issues in dispute in the underlying litigation. *Id.* at 407–08. "Moreover, allowing the claim could subject the courts to a flood of similarly duplicative claims and effectively chill the vigorous representation of clients by their attorneys." *Id.* at 408.

These reasons apply with equal force to the matter before the Court. Here, like in *Larobina*, the Beans have yet to establish that the Williamses were not legally entitled to any of the relief the Williamses seek, which the Beans allege form the basis of the Williamses' allegedly oppressive litigation. *See id.* at 407. Neither have the Beans, like in *Larobina*, established that the Williamses have "no good-faith reason to believe that [the Williamses are] entitled to the [relief]." *See id.* at 407–08. "Those very issues are in dispute in the [instant] action." *Id.* at 408.

While the Williamses have alleged that the October 2016 letter stated that the Williamses "expect[ed] the trial to attract the press, permanently damaging" Christopher Bean, Amend. Countercl. ¶ 106, at this juncture, the Court will not presume that the Williamses had "no good-faith reason" to bring suit. *Larobina*, 274 Conn. at 407–08. Because the "gravamen of the action for abuse of process is the use of a legal process against another *primarily* to accomplish a purpose for which it is not designed," *id.* at 403, absent disposition of this case, the Court is not in a position to assess whether the Williamses' use of legal process was designed "*primarily* to accomplish a purpose for which it is not designed." *Id.*; *see also id.* at 403–04 (noting that comment b to the Restatement Second (1922) of Torts § 682 "explains that the addition of primarily is meant to exclude liability when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant."). "Moreover, allowing the claim could subject the [C]ourt[] to a flood of similarly duplicative claims and effectively chill the vigorous representation of [the Williamses] by their attorneys." *Id.* at 408.

Contrary to the Beans' contention that *Rogan* overturned *Larobina sub silentio*, *Rogan* and *Larobina* exist in harmony. In *Rogan*, also a dispute between neighbors, defendant brought a counterclaim against plaintiff for abuse of process. 165 Conn. App. at 212–13. The court affirmed the lower court's determination that there was sufficient evidence in the record to support Defendant's claim of abuse of process. *Id.* at 219. Because, however, "all of the counts of the plaintiff's complaint had been stricken or had been disposed of by summary judgment . . . by the time this case came on for trial . . . the only issues before the court were those raised by the defendant's five[-]count counterclaim," including defendant's claim of abuse of process. *Id.* at 213. At the time of trial, the court in *Rogan* was able assess whether the plaintiff's use of legal

process was designed "*primarily* to accomplish a purpose for which it is not designed." *Larobina*, 274 Conn. at 403. The same is not true here.

The Williams' motion to dismiss the abuse of process claim is therefore granted.[4]

## B.    Invasion of Privacy

The Beans contend that the Williamses allegedly acted with intention to intrude on the Beans' private enjoyment of their home with such severity as to cause the Beans to feel intimidated, embarrassed and bullied. Amend. Countercl. ¶¶ 70–75. The Williamses move to dismiss the Beans' counterclaim for invasion of privacy on two bases: That the Beans fail to allege the Williamses acted with the requisite intention and that the Williams' alleged conduct was not sufficiently offensive. Pls.' Br. at 5–6. The Court finds the Beans have plead sufficient detail to merit further factual discovery.

"One who intentionally intrudes physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person." *Gallagher v. Rapoport*, No. CV 960149891S, 1997 WL 240907, at *2 (Conn. Super. Ct. May 6, 1997) (citing Restatement (Second) of Torts § 652B (1977)).

The Beans alleged that "Ms. Williams stood at the side entrance of her property," "holding an iPad or other digital recording device and point[ing] and gestur[ing] wildly." Amend. Countercl. ¶ 78. "Connecticut trial courts have allowed causes of actions asserting unreasonable intrusion based upon claims of non-physical conduct." *Cavallaro v. Rosado*, No. CV054009939, 2006 WL 2949143, at *4 (Conn. Super. Ct. Oct. 5, 2006) (listing cases in which

---

[4] Because the Williamses' claim fails for want of maturity, the Court need not reach whether the Williamses have plead sufficient facts to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

courts have allowed claims of invasion of privacy to proceed where defendants made comments about plaintiff's sex lives; eavesdropping on plaintiff's home; or secretly tape recorded another employee). As alleged, a reasonable person could believe that Ms. Williams acted with intent to intrude. *See Cavallaro v. Rosado*, No. CV054009939, 2006 WL 2949143, at *4 (Conn. Super. Ct. Oct. 5, 2006) ("[V]erbal statements or non-physically intrusive conduct may adequately support a claim for intrusion upon seclusion."); *WVIT, Inc. v. Gray*, No. CV 950547689S, 1996 WL 649334, at *4 (Conn. Super. Ct. Oct. 25, 1996) ([A] complaint alleging that an employee has for personal reasons [surreptitiously] recorded conversations of a fellow employee . . . states a cause of action for unreasonable intrusion on the privacy of another by intruding on their 'person.'").

The Williamses argue that at all times they were on their own property and intrusion upon seclusion cannot lie where matters are "exhibited to the public gaze." *Fiorillo v. Berkley Adm'rs*, No. CV010458400S, 2004 WL 1153678, at *3 (Conn. Super. Ct. May 5, 2004). It cannot be that by virtue of the Williams "public" conduct, anything viewed by them from their own property is necessarily open to public gaze. After all, Stonington Borough is allegedly "densely populated," Amend. Countercl. ¶ 1, and the Beans acknowledge that the Bean and Williams properties are "immediately adjacent." Compl. ¶ 6. While the Beans are ostensibly not well positioned to know at the pleading stage whether Ms. Williams was using the digital recording device or what was recorded with it, if anything, the Beans have offered enough detail to plausibly allege that the Williamses, from their own property, could have overseen or overheard the Williams' private affairs using a digital recording device. *See* Restatement (Second) of Torts § 652B, cmt. b (1977) ("It may also be by the use of the defendant's senses,

with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires.").

The Williams' motion to dismiss the Beans' claim for invasion of privacy is denied.

## C.    Defamation

The Beans allege that the Williamses have defamed the Beans through a serious of e-mails and letters Mr. or Ms. Williams sent members of the surrounding community. For example, the Beans have alleged that on August 31, 2015, Ms. Williams sent an e-mail to neighbor Lynn Young allegedly stating "Mr. Bean plans to build high enough to see over our hedge. If he does and peers into our privacy, we'll know he's a peeping tom." Amend. Countercl. ¶ 34. The Beans have alleged that, on February 9, 2016, Ms. Williams sent an e-mail to Ms. Richards stating that the Bean Property "ruin[ed] the look of Water Street," and went on to call Mr. Bean a "barbarian." *Id.* ¶ 40. The Beans have alleged that, on March 4, 2016, Ms. Williams allegedly sent an e-mail to an individual named "Josie," stating that Mr. Bean "told the world he'd build to see into our yard and he's done it." *Id.* ¶ 55 n. 3. The Beans further allege that on July 20, 2016, Ms. Williams sent identical e-mails to five neighbors, Tom Hausman, Al Razzano, Heidi Reavis, Ms. Richards, and Mary Fitzgibbons, allegedly stating that the Beans were snooping on the Williamses and that "last week a young man from next door began taking photographs of us in our garden." *Id.* at 86.[5]

Rather than address whether the Complaint affords the Williamses sufficient notice of the communications complained of to enable them to defend themselves, the Williamses instead

---

[5] The Court notes this list of allegations that the Beans contend are defamatory should not be read as representing the totality of sufficiently plead defamatory comments.

attempt to show how each communication complained of fails as a matter of law. *See generally* Ps.' Supp. Br. This type of analysis is inappropriate at the pleading stage.

"Under Connecticut law, to establish a prima facie case of defamation, a plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 364 (D. Conn. 2014) (internal quotation marks and citation omitted); *see also Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627-28 (Conn. 2009).

The pleading of claims for defamation is governed by the liberal standards of Fed. R. Civ. P. 8, and not a more heightened standard. *See Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986). "The test of a [defamation] complaint's sufficiency is whether it is detailed and informative enough to enable defendant to respond and to raise the defense of res judicata if appropriate . . . . The central concern is that the complaint afford defendant sufficient notice of the communications complained of to enable him to defend himself." *Id.* (internal quotation marks and citations omitted). In order to provide such sufficient notice, a plaintiff must plead what defamatory statements were made concerning the plaintiff, when they were made, and to whom they might have been made. *Abrahams v. Young & Rubicam*, 979 F. Supp. 122, 128 (D. Conn. 1997); *see also U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 109 (D. Conn. 2006) (defamation plaintiff "must at least plead the content of the alleged communications, when they were made, the context in which they were made, or by and to whom they were made"). The Beans have alleged facts that go to each of these elements.

Citing *Dongguk University v. Yale University*, the Williamses argue that the Complaint must plead and satisfy each element of a *prima facie* case of defamation. 734 F.3d 113, 123 (2d Cir. 2013). The Court disagrees. Yes, "[u]nder Connecticut law, each statement is a separate cause of action and requires proof of each of the elements for defamation." The Court, however, must recognize the "difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings, for example by summary judgment." *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 410 (2d Cir. 2000). In *Dongguk University*, the case under review involved summary judgment, and is therefore of limited value to the matter pending before the Court. 734 F.3d at 122.

### 1. Privilege

The Williams' argument that, at the pleading stage, the Beans' defamation claims are privileged because they relate to matters of public concern and are therefore protected by the First Amendment or are privileged as statements made during the course of a judicial or quasi-judicial proceeding, Pls.' Supp. Br. at 3, is, on the limited facts before the Court, similarly premature.

### a. Public Concern

The U.S. Constitution places limits on common law defamation actions. "[I]n a suit by a private plaintiff involving a matter of public concern, . . . defamatory statements must be provably false, and the plaintiff must bear the burden of proving falsity, at least in cases where the statements were directed towards a public audience with an interest in that concern." *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 149 (2d Cir. 2000). "[W]hether a publication addresses a matter of public concern 'must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Id.* at 150 (quoting *Connick v. Myers*, 461

U.S. 138, 147 (1983)). "[T]o survive this motion to dismiss, [a plaintiff] must have shown that a reasonable person could find that the challenged statement alleges or implies a provably false fact." *Id.* at 155.

The Beans have done just this. By way of example, the Beans have alleged that Ms. Williams's May 26, 2016, e-mail to "Private Lives," stated that Mr. Bean had said that "[t]his house under renovation is going to be so tall I will be able to look right into the Williams' garden." Amend. Countercl. ¶ 74. Ms. Williams allegedly further stated that the Renovation Plan was "designed for spying" on the Williamses. *Id.* The Beans, however, have alleged that while the Design Plan incorporated south and southwest-facing windows "to take advantage of south facing solar gain, the natural light, and the Water Views," *id.* ¶ 26, the Design Plan did not change the footprint or height of the existing home on the Bean Property. *Id.* ¶ 28. Assuming, but not deciding, that communications regarding the Design Plan are matters of public interest, the challenged statement reasonably can be understood to imply that the Beans, by way of the Design Plan, while provably false, intended to surveil the Williams' private comings and goings. *See Flamm*, 201 F.3d at 155. The Beans are entitled to continue with this claim, and the authority the Williamses cite to do not say otherwise. For example, in *Goodrich v. Waterbury Republican-American, Inc.*, in which the court found that the challenged articles published in defendant's newspaper were privileged as "newsworthy matters," 188 Conn. 107, 134 (1982), the court was reviewing plaintiff's assignment of error to the trial court's directing the verdict and refusing to set aside the verdict. *Id.* at 107. *Goodrich*, therefore, does not require a determination as to whether certain alleged defamatory statements are privilege at the pleading stage.

**b. Judicial Privilege**

"In Connecticut, parties to or witnesses before judicial or quasi-judicial proceedings are entitled to absolute immunity for the content of statements made therein." *Field v. Kearns*, 43 Conn. App. 265 (1996). "It is well settled that communications uttered or published in the course of judicial proceedings are absolutely privileged as long as they are in some way pertinent to the subject of the controversy." *Gallo v. Barile*, 284 Conn. 459, 465–66 (2007). "The effect of an absolute privilege in a defamation action . . . is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously." *Chadha v. Charlotte Hungerford Hosp.*, 272 Conn. 776 (2005).

Judicial privilege does not bar the Beans' defamation claim. The Williamses, as an example, argue that Ms. Williams's March 7, 2016, e-mail to Mr. Alstiel is barred by absolute privilege by virtue of the fact that Mr. Alstiel was the alleged single recipient, is allegedly one of the Williams' principle witnesses in this matter and had allegedly contacted the Williamses in an effort to build support for an earlier lawsuit Mr. Alstiel had brought, and since settled, against the Beans regarding the Design Plan. Pls.' Supp. Br. At 18. The Beans allege the March 7, 2016, e-mail to Mr. Alstiel from Ms. Williams stated that "[Mr.] Bean had said he planned to build so high he could see over our hedge into our Garden." Amend. Countercl. ¶ 59.

Absent are details the Court would need to intelligently determine whether the privilege applies, i.e., whether Mr. Alstiel's lawsuit was "in some way pertinent to the subject of the [instant] controversy." *Gallo*, 284 Conn. at 466. It is conceivable, given the paucity of factual detail at the pleading stage, that Mr. Alstiel challenged the Design Plan because it included painting the exterior of the Beans' home the color lavender. While "the [C]ourt must particularly evaluate the factual circumstances peculiar to each case to determine whether application of

absolute privilege is warranted," at present, the Court is not able to do so. *Kelley v. Bonney*, 221 Conn. 549, 573 (1992).

With these allegations, the Williamses have provided "sufficient notice of the communications complained of, and the more particular details may be drawn out in discovery." *Bailey v. ESPN, Inc.*, No. 3:14-CV-01509 VAB, 2015 WL 4601101, at *8 (D. Conn. July 29, 2015) (citing *Boyd*, 208 F.3d at 410) (observing the importance of "recogniz[ing] the difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings, for example by summary judgment" and noting that "a plaintiff may allege facts suggestive enough to warrant discovery, even where those facts alone would not establish a cause of action for defamation").[6]

The Williams' motion to dismiss the Bean's defamation claim is denied.

### D.     Absolute Private Nuisance and Negligent Private Nuisance

The Beans have brought both absolute private nuisance and negligent private nuisance claims against the Williamses. The Beans have alleged that the Williams' actions, Amend. Countercl. ¶¶ 78–81, including that the Williamses have positioned themselves near or in front of the Bean Property while "making inflammatory gestures," *id.* ¶ 81, Ms. Williams stood at an entrance to the property holding "an iPad or other digital recording device" while "gesture[ing] wildly," *id.* ¶ 78, and the Williamses used their persons to obstruct the entrance to the Bean Property from the street, *id.* ¶ 79, all of which have "made the Bean Family uncomfortable moving about their own home." *Id.* ¶ 83. The Beans alleged they are "reluctant to go outside when the Williams are in Stonington and avoid inviting friends and family to visit for fear that

---

[6] Of course, if discovery yields no evidence to corroborate these allegations, the claim must be dismissed at the summary judgment stage.

they will be subjected to the Williams' harassment." Amend. Countercl. *Id.* ¶ 84. The Beans further allege that the Tree Wall the Williamses planted along the Bean-Williams property line blocks large portions of the Bean Property's Water Views, *id.* ¶ 95 which the Beans allege is a defining characteristic of the property. *Id.* ¶ 23. The Williamses contend that the Beans have failed to complain of a condition that tends to cause danger, an essential element of private nuisance and therefore the claims must fail as a matter of law. The Williamses misstate the law of nuisance.

Under Connecticut law, "a private nuisance exists only where one is injured in relation to a right he enjoys by reason of his ownership of an interest in land." *Ming Li v. Colonial BT, LLC*, No. 3:14-CV-999 (CSH), 2015 WL 5684060, at *4 (D. Conn. Sept. 28, 2015). In other words, "[a] private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Pestey v. Cushman*, 259 Conn. 345, 352 (2002) (quoting 4 Restatement (Second), Torts § 821D (1979)). "The essential elements of a private nuisance claim in Connecticut are: (1) an unreasonable interference with the plaintiff's use and enjoyment of his or her property; (2) the defendant's conduct was the proximate cause of the unreasonable interference; and (3) if injunctive relief is sought, that the defendant's conduct will cause irreparable harm and there is no legal remedy." *Li*, 2015 WL 5684060, at *4. Absolute nuisance has the added requirement that the conduct be "intentional." *Green v. Ensign-Bickford Co.*, 25 Conn. App. 479, 490 (1991) (citing *Monick v. Town of Greenwich*, 144 Conn. 608, 611, 136 A.2d 501, 503 (1957)). "Intentional . . . means not that a wrong or the existence of a nuisance was intended, but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance." *Id.*

The Beans have plausibly alleged that the Williams' conduct, including planting the Tree Wall, has unreasonably interfered with the Beans' use and enjoyment of their property, the Williamses' conduct was the proximate cause of this injury, and, at least relating to the Tree Wall, the Beans have suffered irreparable injury. Furthermore, the Beans have alleged that the Williams' acted with the intention to bring about the conditions which the Beans allege are a nuisance.

The Williamses argue that, under Connecticut law, a claim of private nuisance requires a condition on the Bean Property created by the Williams' purported conduct that has a tendency to create danger. As *Pestey* explains, however, private nuisance "is concerned with conduct that interferes with an individual's private right to the use and enjoyment of his or her land," 259 Conn. at 357, whereas public nuisance "is concerned with the interference with a public right, and cases in this realm typically involve conduct that allegedly interferes with the public health and safety." *Id.*; *see also Li*, 2015 WL 5684060, at *4 ("The law of private nuisance arises from the general principle that it is the duty of every person to make a reasonable use of his own property so as to occasion no unnecessary damage or annoyance to his neighbor." (internal quotation marks omitted) (quoting *Nailor v. C. W. Blakeslee & Sons*, 117 Conn. 241, 167 A. 548, 549 (1933))*; id.* at *6 (stating that an "essential element" of public nuisance is that the "the condition complained of has a natural tendency to create danger and inflict injury upon persons or property"). *But see Popow v. Town of Stratford*, No. 307-CV-1620VLB, 2010 WL 537752 (D. Conn. Feb. 12, 2010) (suggesting that an element of private nuisance is a "condition" that has a "natural tendency to create danger and inflict injury upon person or property" yet the claim at issue was one sounding in public nuisance).

*Li* does not suggest otherwise. In discussing the danger created by an apartment complex's pool, *Li* states that plaintiffs "allegations describe conditions which combine to allege sufficiently" a claim for private nuisance. *Id.* at *4. In other words, a dangerous condition is sufficient but not necessary to state a claim for private nuisance. *See id.*

The Williams' motion to dismiss the Bean's claims for absolute private nuisance and negligent private nuisance claim is denied.

### F.      Conn. Gen. Stat. §§ 52-480, 52-570

The Beans argue that the Williamses, acting with malicious intent, Amend. Countercl. ¶ 139, "erected structures" on their property in the form of a uniform row of 30 trees that are, at present, approximately fourteen feet in height, *id.* ¶ 139, and designed to eliminate the Water Views that "enticed" the Beans to purchase the property in the first instance. *Id.* ¶ 87. The Beans further alleged that the trees are located on the border of the Bean Property and serve no useful purpose to the Williamses other than to annoy and injure the Beans, *id.* ¶ 140, by eliminating one of the Property's most desirable features, the Water Views, thus impairing the fair market value of the Property. *Id.* ¶ 141. The Williamses, for their part, argue that the Beans have failed to sufficiently allege the "actual assistance" of a "structure" which is of no use to the Williamses. Pls.' Br. at 20. The Beans have alleged a plausible violation of Conn. Gen. Stat. §§ 52-480, 52-570, and the claims may proceed.

Connecticut law provides that "[a]n action may be maintained by the proprietor of any land against the owner or lessee of land adjacent, who maliciously erects any structure thereon, with intent to annoy or injure the plaintiff in his use or disposition of his land." Conn. Gen. Stat. § 52-570. Furthermore, "[a]n injunction may be granted against the malicious erection, by or with the consent of an owner, lessee or person entitled to the possession of land, of any structure

29

upon it, intended to annoy and injure any owner or lessee of adjacent land in respect to his use or disposition of the same." Conn. Gen. Stat. § 52-480.

"The elements essential to prove each statutory section are the same." *Geiger v. Carey*, 170 Conn. App. 459, 486–87 (2017). Each statute requires the following:

> (1) the defendant to have built a structure on said defendant's land; (2) the erection of the structure must have been malicious; (3) the defendant must have intended to injure the enjoyment of the adjacent landowners land by the erection of the structure; (4) the structure must impair the value of the plaintiff's land; (5) the structure must be useless to the defendant; and (6) the enjoyment of the plaintiff's land must be, in fact, impaired."

*Id.* at 486–87. The word "proprietor" means an owner. *Id.* at 486 (2017).

Taken together, the Beans have plausibly alleged that the Williams have erected, with malicious intention, a structure of thirty trees that is of no use to the Williams' other than to diminish the Property's market value and impair the Beans' use and enjoyment of the property.

*Dalton v. Bua* does not require a different outcome. 47 Conn. Supp. 645, 649 (2003). While *Dalton* notes that "[a]n obstruction that is not 'artificially built up' is not a 'structure,'" *id.* at 648, here, the Beans have plausibly alleged that the Tree Wall, "composed of parts and joined together in some definite manner" is "artificially built up" to obstruct the Williams' use of enjoyment of their Property. *Dalton*, 47 Conn. Supp. at 648; *see also Patrell v. Gaudio*, No. CV095012873S, 2010 WL 5610843, at *3 (Conn. Super. Ct. Dec. 15, 2010) ("*Dalton* does not stand for the proposition that there is some inherent quality of a hedge that categorically puts it outside of the definition of 'structure.'"); *id.* (finding that defendant was not entitled to judgment as a matter of law in a challenge to defendant having planted an earthen berm and line of trees on her property). While the Williamses may foreseeably claim that they built the Tree Wall with the intention of ensuring their ability to enjoy their property in privacy, it does not follow that they could not have acted with the malicious intention to also injure the Beans or that the entirety of

the Tree Wall is therefore of use to the Williamses. *See Geiger*, 170 Conn. App. at 476 (finding

that a portion of the challenged fence was useful to shelter defendant's property from "storage of

unknown liquids and other large junk-like objects," while another portion of the fence served no

such purchase).

The Williams' motion to dismiss the Bean's claims under Conn. Gen. Stat. §§ 52-480,

52-570 are denied.

### H.      Private Enforcement of Stonington Borough Zoning Regulations

The Beans allege that the Tree Wall blocks substantial portions of the Bean Property's

Water Views, Amend. Countercl. ¶ 95, that the species of tree planted will likely grow to thirty

feet or more, which would eliminate the Bean Family's Water View, *id.* ¶ 96, and that the Tree

has adversely impacted the property's value and marketability. *Id.* ¶ 97. The Beans specifically

allege that the Water Views "were the primary reasons Mr. Bean and Ms. Black decided to

purchase the Bean Property." *Id.* ¶ 24. The Beans further allege that the Tree Wall violates the

Stonington Zoning Regulations Sections 3.1.1[7], 3.1.2.1[8], 3.6.3[9] and 3.3.1.1.[10] The Williams argue

that, as plead, the Beans have failed to allege an actual violation of the regulations at issue. The

Beans have raised a plausible violation Stonington Zoning Regulations, and the claims may go

forward.

---

[7] "The Planning and Zoning Commission has found that the loss of aquatic vistas, blocked by buildings and structures which obstruct views of the sea, destroys the very character of the Borough as a seaside community . . . . [T]he Borough wishes to protect and enhance the remaining vistas of the sea." Amend. Countercl. ¶ 157.

[8] "Building's and structures shall be located in such a way as to provide the maximum views of the water from the nearest public street . . . ." *Id.* ¶ 158.

[9] "Fences four feet or higher must be authorized by the Commission. Fences in excess of six feet in height may be authorized by Special Permit only."

[10] "All Construction, modification, or change in use of buildings, facilities, and property within the coastal boundary shall be subject to . . . . coastal site plan review requirements . . . ."

Under Connecticut law, "nearby property owners specifically and materially damaged by the violation of zoning regulations may bring private zoning enforcement actions directly to the Superior Court, without first applying to municipal zoning authorities, as an exception to the exhaustion of administrative remedies doctrine." *Reichenbach v. Kraska Enterprises, LLC*, 105 Conn. App. 461 (2008); *accord Reynolds v. Soffer*, 183 Conn. 67, 69 (1981) ("[A]ny person specifically and materially damaged by a violation of the zoning ordinances which has occurred or is likely to occur on another's land may seek injunctive relief restraining such violation."); *Battistoni v. Zoning Bd. of Appeals of Town of Morris*, No. CV0083195S, 2001 WL 1178683, at *4 (Conn. Super. Ct. Sept. 6, 2001).

To seek injunctive relief to remedy direct injury from a zoning violation, the "property owner" must establish "(1) that injury from failure to grant an injunction is imminent; (2) the injury is substantial; (3) the injury is irreparable and there is a substantial probability that unless an injunction is issued the party seeking it will suffer irreparable harm." *Stewart v. Gothie*, No. CV990549831S, 2001 WL 686851, at *4 (Conn. Super. Ct. May 25, 2001) (citing *Karls v. Alexandra Realty Corp.*, 179 Conn. 390, 401 (1980)). The Beans have plausibly claimed as much.

The Williamses argue that the Beans have failed to allege imminent or irreparable harm because allegedly the Williamses twice had their gardener notify the Beans of the Williams' plan to plant trees along the property line. Amend. Countercl. ¶¶ 89, 92. The Court is not convinced. Moreover, absent more factual detail regarding what the Beans knew, or should have known, and when, the Court is not well positioned to assess why the Beans allegedly failed to immediately raise their hackles at news of the Williams' plan to plant taller trees. The Court also recognizes that some families and individuals are naturally more litigious than others. As plead, it is by no

means a foregone conclusion that the Beans have somehow waived their right to claim that the Tree Wall amounts to a substantial and irreparable injury to the Beans.

It is uncontested, however, that Matthew and Christopher Bean are not owners of the Bean home, *see* Amend. Countercl. ¶ 22, and thus cannot be proprietors under Conn. Gen. Stat. § 52-480. The Williams' motion to dismiss is granted as to Matthew and Christopher Bean but denied as to Mr. Bean and Ms. Black.

## IV.  SEALED DOCUMENTS

The Williamses have requested that Ms. Williams's entire deposition transcript and all exhibits to that deposition be designated Confidential under the Court's Standing Protective Order. 4/7/2017 Motion to Seal at 1-2. The Beans object to the Williams' designation of the entire transcript of Ms. Williams's deposition and all exhibits thereto being designated Confidential. *Id.* Ms. Williams's deposition transcript and its exhibits must be unsealed.

A First Amendment "presumptive right of access" applies to both criminal and civil proceedings, which applies to, "among other things," "summary judgment motions and documents relied upon in adjudicating them," "pretrial motions and written documents submitted in connection with them," "and docket sheets." *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 163-64 (2d Cir. 2013) (collecting cases).

There is also a common law right of public access that is "firmly rooted in our nation's history" and "based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (citing *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*")). This common law right attaches if a document is a "judicial document," or an

item that is filed and that is "relevant to the performance of the judicial function and useful in the judicial process." *Id.* "In order to determine whether a judicial document may be filed under seal, the court must balance the common law right of access against any competing considerations, such as . . . the privacy interests of those resisting disclosure." *Raffaele v. City of New York*, No. 13-CV-4607 (KAM) (VVP), 2014 WL 2573464, at *1 (E.D.N.Y. June 9, 2014) (internal quotation marks omitted) (citing *Lugosch*, 435 F.3d at 120). "Under both the common law and First Amendment frameworks, the party seeking to file a document under seal bears the burden of demonstrating that sealing is warranted." *Id.* (citing *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 826 (2d Cir. 1997)).

Court filings "should not remain under seal absent the most compelling reasons." *Lugosch*, 435 F.3d at 125 (discussing both common law and First Amendment rights of access to documents filed in support of civil summary judgment motion). The basic rule is that "[t]o overcome the First Amendment right of access, the proponent of sealing must demonstrate that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 144 (2d Cir. 2016) (internal quotation marks omitted). "Broad and general findings and conclusory assertions are insufficient to justify deprivation of public access to the record, specific, on-the-record findings are required" if the district court is to seal a proceeding. *Id.* at 144–45 (finding that attorney-client privilege concerns were insufficient to justify sealing of complaint alleging that law firm partners engaged in kickback scheme) (internal quotation marks omitted). Accordingly,

> [t]he party seeking to seal the documents in question bears the burden of showing that higher values overcome the presumption of access. In certain instances, the privacy interest of the person resisting disclosure can be sufficient to overcome the public right of access. However, any claimed exception to the right of access should be based on a particularized showing of need, and any redactions would be required to be narrowly tailored to accomplish the overriding interest.

*United States v. King*, No. 10-CR-122 (JGK), 2012 WL 2196674, at *2 (S.D.N.Y. June 15, 2012)

(internal citations omitted); *see also Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir.

2004) (explaining that where a party seeking to keep court documents under seal "made no effort

to rebut" the presumptive right of access "by establishing that there was a continuing compelling

reason to require that the documents remain under seal" then "the district court was well within

its discretion to order that the seam on the documents be lifted").

"In balancing the public right of access against a party's privacy interest, a court should

consider the degree to which the subject matter is traditionally considered private rather than

public." *Bolia v. Mercury Print Prods., Inc.*, No. 02-CV-6510T, 2004 WL 2526407, at *3

(W.D.N.Y. Oct. 28, 2004) (citing *Amodeo*, 71 F.3d at 1051). To the extent that a party to a civil

case requests that a court document or underlying documents from discovery be sealed, courts

recognize that parties to whom the documents pertain may have "a privacy interest," but that

such privacy interests may be "outweighed . . . by the public's right of access." *Lown v.*

*Salvation Army, Inc.*, No. 04-CIV-01562 (SHS), 2012 WL 4888534, at *3 (S.D.N.Y. Oct. 12,

2012). Courts have found that the "higher value" of a party to the case, or even a third party's

privacy interests may not overcome "the presumption of access [that] titles the balance in favor

of disclosing th[e] material." *Id.*

A Court's protective orders "issued for the purposes of facilitating discovery . . . do[] not

bear on the presumption of access to the motion papers." *Raffaele*, 2014 WL 2573464, at *2; *see*

*also Lugosch*, 435 F.3d at 125-26 (explaining that existence of protective orders to facilitate

discovery are not a "strong factor against access" and noting that even in the absence of a

confidentiality order "civil litigants have a legal obligation to produce all information which is

relevant to the subject matter involved in the pending action" and that "the mere existence of a

confidentiality order says nothing" about whether using that order "to avoid disclosure [is] reasonable" particularly because such orders generally "contemplate[] that relief from the provisions of the order may be sought at any time").[11]

The Court's Standing Protective Order provides for documents or portions of documents to be designated confidential information that the disclosing party "reasonably and in good faith believes contains or comprises (a) trade secrets, (b) proprietary business information, or (c) information implicating an individual's legitimate expectation of privacy." ECF No. 11. The matter before the Court does not concern trade secrets or proprietary business information, and the Williamses have made no representation to the Court that designation of the deposition and exhibits were made confidential because they implicate a legitimate expectation of privacy.

Because the Williamses have "made no effort to rebut" the presumptive right of access "by establishing that there was a continuing compelling reason to require that the documents remain under seal" the Court orders that all documents in this matter be unsealed. *Gambale*, 377 F.3d at 142.

## V.    CONCLUSION

The Williams' Motion to Dismiss is **GRANTED** in part and **DENIED** in part. The Court grants to the motion to dismiss Count One in its entirety and Count Five and Count Six as to Christopher and Matthew Bean. The Court otherwise denies the motion to dismiss Count Two through and including Count Eight.

The Court **ORDERS** that all documents in this matter should be unsealed.

---

[11] *See Gambale*, 377 F.3d at 141 ("It is undisputed that a district court retains the power to modify or lift protective orders that it has entered.")

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of September, 2017.


                                      /s/ Victor A. Bolden
                                    VICTOR A. BOLDEN
                                    UNITED STATES DISTRICT JUDGE