## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **DAVE WILLIAMS, ET AL** | **CIVIL ACTION NO.:  3:16-CV-01633-VAB** |
| **Plaintiffs,** | |
| **v.** | |
| **RANDALL BEAN, ET AL** | **JULY 20, 2018** |
| **Defendants.** | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Discovery has revealed that this lawsuit is the culmination of a calculated campaign to sully and besmirch the good name of the Defendants because they purchased a waterfront house ("the Bean Residence"), located next to the Plaintiffs' house, made renovations which the Plaintiffs did not like and built a dock extending from the property into the adjacent Stonington Harbor.  Throughout this process, the Beans were considerate of the Plaintiffs, attempted to be good neighbors and obtained all necessary municipal approvals.[1]  The newly renovated waterfront home contained windows and decks designed to take advantage of the tremendous water views.[2] Incredibly, the Plaintiffs believe the Beans are more interested in looking into their backyard, rather than looking beyond the Plaintiffs' property to enjoy the breathtaking views the area is known for.

---

[1] The renovation was done with the unanimous approval of the local planning and zoning commission, and the dock was built with the unanimous approval of the local harbor commission.

[2] See Photographs taken from 28 Water Street (Exhibit 1).

Fueled by resentment over the Beans' lawful use and enjoyment of their property, the Plaintiffs began their campaign and started to refer to the Beans as "peeping toms." They did so long before any of the alleged incidents of "spying" ever took place, simply because the Beans made improvements they had every right to make and had the nerve to use and enjoy their newly renovated property.

While the Plaintiffs claim that a member of the Bean Family "spied on" and "surveilled" the Plaintiffs on their property, there is no evidence that this ever occurred. All that ever occurred was Christopher Bean's photographing the planning and installation of the Plaintiffs' hedge, which the Plaintiffs installed in violation of the Borough of Stonington's regulations and which is the subject of one of the Counterclaims in this action. *See Answer and Amended Counterclaims, Count VIII (Document Entry No. 41).* As set forth in this memorandum, the Plaintiffs' claims are meritless and the Bean Family is entitled to summary judgment on all causes of action alleged in the August 31, 2016 Complaint.

## II.   FACTUAL BACKGROUND

### a. The Williams Property, the Bean Property, and the Renovations to the Bean Property

The Plaintiffs own a house in the Borough of Stonington, Connecticut located at 24 Water Street ("the Williams Property"). Local Rule 56(a)(1) Statement of Undisputed Material Facts ("SoF"), ¶ 1. The Defendants are Randall Bean and his wife, Elizabeth Black, and their sons, Matthew and Christopher Bean ("the Beans" or the "Bean Family"). The Beans reside in Boston but had vacationed in Stonington for years in a house they owned on Broad Street. SoF, ¶ 2. In or about July 2014, the Beans began considering the purchase of a waterfront home in Stonington and identified the property

located 28 Water Street as a possibility. This house was located adjacent to and directly north of the Williams Property.  Id. at ¶ 3.  It was approximately 150 years old at the time the Beans became interested in it, and required a substantial renovation.  Id. at ¶ 4. The Beans therefore asked a local real estate agent, Lynn Young, to send an e-mail to the Plaintiffs to ascertain their position on a potential renovation of the house in the event they decided to purchase it.  Id. at ¶¶ 5-6.  The Plaintiffs responded that they were "perfectly okay" with any work the Beans did at 28 Water Street so long as it conformed to Borough regulations.  Id. at ¶ 6.  Ultimately, the Beans purchased 28 Water Street ("the Bean Property") in October 2014.  Id. at ¶ 7.

After purchasing the Bean Property, the Beans retained a prominent architectural firm, New England Design, Inc., to design a renovation of the home.  SoF, ¶ 8.  Plans were drawn up and an application was submitted to the Stonington Borough Planning & Zoning Commission in March 2015.  Id. at ¶ 9.  At the same time, the Beans reached to out a friend of the Plaintiffs, Thomas Hausman, in an effort to broker a meeting with the Plaintiffs to discuss the renovation and address any concerns the Plaintiffs might have had.  Id. at ¶ 10.  However, the Plaintiffs ignored the Beans' offer and never met with them.  Id.  The Plaintiffs did not oppose the renovation plan, which was supported by many members of the community and unanimously approved by the Stonington Borough Planning & Zoning Commission on March 18, 2015.  Id. at ¶ 11.

After the Stonington Borough Planning & Zoning Commission approved the Beans' renovation plan, several neighbors took an appeal of that decision to the Superior Court.  SoF, ¶ 12.  The Plaintiffs were not a party to that appeal, which ultimately resolved by a Stipulated Agreement, dated November 24, 2015.  Id.

Kevin Tubridy, and his team at New England Design, Inc. designed the renovation of the Bean Residence, which included a small, 292 square foot, single story addition to the west side (facing Stonington Harbor) of the Bean Property.  SoF, ¶ 13. Contrary to the allegations in the Complaint, the height of the Bean Residence was not changed and an additional floor was not constructed during the renovation. Id. at ¶ 14; see also Complaint at ¶ 7.  The renovation was designed with predominantly south and southwest facing windows to take advantage of solar gain, natural light, and views of Montauk Point, Fishers Island, and Fishers Island Sound.  Id. at ¶ 15.   The design includes fewer north-facing windows at the Bean Residence because there are limited views and no solar gain.  Id. at ¶ 16.

In August 2015, the Beans filed an application with the Town of Stonington Harbor Management Commission to construct a dock at their property.  SoF, ¶ 18.  Mr. Bean provided notice to the Plaintiffs and also attached a copy of the application.  Id. at ¶ 19.  Mr. Williams objected[3] to the dock application because it would "add to noise, pollution, and risk damage to eelgrass."  Id. at ¶ 20.  In addition, Mr. Williams objected on the grounds that when he and his wife purchased their property six years earlier, they were told that "no more docks would be permitted."  Id.  The Beans' application to build the dock was unanimously approved by the Town of Stonington Harbor Management Commission in September 2015 over the Plaintiffs' objection.  Id. at ¶ 22.

---

[3] Even though the Plaintiffs, too, have a dock off their property.  SoF, ¶ 21.

**b.      The Plaintiffs Begin their Campaign Against the Bean Family**

By the time the Beans' dock application was submitted in August 2015, the Plaintiffs had begun their campaign to defame and harass the Bean Family which ultimately resulted in this meritless lawsuit.[4]

In the Spring of 2015, a neighbor named Martina Durner, who was an appellant in the zoning appeal lawsuit arising out of the approval of the renovation of the Bean Residence, e-mailed Mrs. Williams on May 15, 2015 and asked: "What do you think about the plans for the new house of your neighbors?  We have been trying to get them to lower their deck.  They would not budge because they want to be able to look over your hedges."[5]  SoF, ¶ 24.  No member of the Bean Family ever made such a statement to Ms. Durner.  Id. at ¶ 25.

On August 25, 2015 the Plaintiffs sent an e-mail to Lynn Young, expressing concern that the Beans would not repair their seawall and that damage to the Beans' wall might cause seawater to come onto their property.   SoF, ¶ 26. In response, Ms. Young stated "I think they will repair the seawall.  Right now they are consumed by the frivolous lawsuit against them and doing what they need to do to make it stop, i.e., do the house renovation. . .Time will tell, but they are responsible people who really wish to do the right thing."  Id.  Mrs. Williams responded to Ms. Young by email dated August

---

[4] This was not the first time that the Plaintiffs had an acrimonious relationship with an owner of the Bean Property.  Subsequent to purchasing the Williams Property in or about 2008, the Plaintiffs brought suit against the prior owner of the Bean Property, G. Warfield Hobbs, IV, alleging that Mr. Hobbs trespassed onto the Williams Property, assaulted a worker on the Williams Property, and damaged the Williams Property.  SoF, ¶ 23.

[5] As noted previously, the Beans' major goal in renovating their house was to maximize water views to the west and to the south, which coincidentally is the same direction the Williams Property is in relation to the Bean Property.  To enjoy these views, one would have to look beyond the Williams Property.  Anyone who had been to the Beans' house before the renovation would understand that the design goal was not to look down into the Plaintiffs' backyard, but rather, beyond it to enjoy the incredible vista in the distance.

31, 2015, in which she said "I know you like Mr. Bean, but we do not for a lot of reasons I'll explain when I see you." She added, "We are told Mr. Bean has no plans to repair the seawall . . . This is a major issue with us . . . We're told our house is at risk because of the neglect of the previous owners." Id. Mrs. Williams also complained that she nearly cried when a tree was removed at the Bean property two days earlier and that she could not "imagine the kind of person who would do that. Certainly no one we would care to know." Id. In conclusion, Mrs. Williams informed Ms. Young that the Plaintiffs were "looking into the various ways we can deal with what is happening," and then, in a post script, began her slanderous campaign against the Beans: "Mr. Bean plans to build high enough to see over our hedge. If he does and peers into our privacy, we'll know he's a peeping tom." Id.

The uncontroverted evidence, expressed in Mrs. Williams' own words, therefore shows that the Plaintiffs' animosity and ill-will toward the Beans began at least ten months before any alleged "spying" or "surveillance" occurred. The Plaintiffs were unhappy with the Beans' use of their property and their renovation and, therefore, began planting seeds in the neighborhood that the Beans, and in particular Mr. Bean, was renovating the house with the express purpose of spying on the Plaintiffs, which is as absurd an allegation as it sounds. Ms. Young responded to Mrs. Williams with the assurance "I don't think they will be able to see over your hedges and, based on the zoning meeting I attended, that is not at all their intent." Id. at ¶ 27.

By February 2016, the Plaintiffs were becoming increasingly upset with the Beans' renovation. Mrs. Williams e-mailed Mr. Hausman and Al Razzano, another neighbor, on February 9, 2016 stating that she had received an email from an

6

unidentified person criticizing the Bean's construction ("Overwhelming bulk, doesn't look as if it belongs here").[6]  SoF, ¶ 28.  Mrs. Williams lamented "[t]his combined with feeling that we now live in [sic] tenement, because the house is jammed into ours- we're looking into a departure from Stonington."  She added "I think the Bean place makes our house much less valuable."  Id.

On February 9, 2016, Mrs. Williams told another neighbor, Betty Richards, "[r]e the Bean house – I could tell he was going to ruin the look of Water Street. He's a barbarian. I'm thinking we'll see if anyone will buy."  SoF, ¶ 28.

The following month, the Plaintiffs escalated their false and malicious comments about the Beans. On March 4, 2016, Mr. Williams e-mailed Ms. Young, Ms. Durner, and another neighbor, Larry Altstiel, stating:

> "You may be aware that Randall Bean and Elizabeth Black have purchased and renovated 28 Water Street, the house to the north of our home, 24 Water.  Mr. Bean has characterized himself as being a friend of ours[7] and having been invited to one of our social events[8], neither of which is true.  He has also told neighbors that he rebuilt 28 Water to a height *so he could look into our garden*.
>
> We are uncomfortable with what Mr. Bean has said about us and his intentions, as reported by friends. We do not know him, and we do not intend to. I write this so you can understand our attitude toward our new neighbor."  SoF, ¶ 29 (emphasis added).

Thus, by March 2016, the speculation about the Beans had gone from the false report in Ms. Durner's May 15, 2015 e-mail that the Beans' said they would not lower their deck because they wanted to be able to look over the Plaintiffs' hedges to Mr.

---

[6] Although the author of this e-mail is not identified, it is difficult to imagine that anyone would be critical of the Beans' house, which was included in the Stonington Garden Club tour in 2017.  SoF, ¶ 17.
[7] No member of the Bean Family had ever characterized themselves as a friend of the Plaintiffs, and after learning of this e-mail, Mrs. Bean wrote to Mr. Williams on March 5, 2016 and said as much.  SoF, ¶ 30.
[8] Mr. Bean and Ms. Black had in fact been invited to the Plaintiffs' residence before March 2016.  As Mrs. Bean explained to Mr. Williams, Mr. Bean and Ms. Black were invited to a social event at the Plaintiffs' residence in 2008.  SoF, ¶ 31.  Mr. Williams testified at his deposition that subsequent to March 4, 2016, he found out that Mr. Bean and Ms. Black "were invited to a party that was held at our house for which we did not design the guest list."  Id.

Williams' false accusation that Mr. Bean told neighbors he built the house to "a height" so he could look into the Plaintiffs' garden.

In an attempt to correct the unfounded accusations against the Beans that had been communicated to Ms. Black by her neighbors, and in an effort to allay the Williams' concerns, she wrote to Mr. Williams on March 5, 2016, explaining that the Beans purchased the property "because we wanted water front property."  SoF, ¶ 32. She assured him that "We have never, in writing or conversation, indicated that the reason for this purchase was so that we could look at your gardens.  I can assure you that we have absolutely no intention of interfering with your privacy and look forward to being cordial and respectful neighbors."  Id.

One day later, on March 6, 2016, Ms. Richards sent Mr. Williams an e-mail stating that she had seen a legal notice in the newspaper stating that Beans were seeking permission from the Connecticut Department of Energy & Environmental Protection to make improvements to their sea wall and to construct a fixed pier at their property.  SoF, ¶ 33.  This was the last straw for Mrs. Williams.  Mr. Williams stated in an e-mail to Ms. Richards on March 6, 2016 that "Reba wants me to send this on.  For her, the dock does it.  Can't live with that and all else next door.  We'll have to move." Id. at ¶ 34.  The following day, March 7, 2016, Mrs. Williams sent Ms. Richards an e-mail confirming that she was intent on moving from Stonington ("The attached letter from [Mr. Bean's] wife suggests they expect to get along with us by lying – not a good outlook. I've had enough. . . It's time to move on.").  Id.

On March 7, 2016, Mrs. Williams wrote to Mr. Altstiel stating that Mr. Bean had told his wife, Ms. Durner, on some unknown occasion that Mr. Bean "planned to build so

high he could see over the hedge into the garden."  Mrs. Williams asked Mr. Altstiel if he or his wife "would repeat that story to a lawyer."  SoF, ¶ 35.  On that same day, Mrs. Williams told Ms. Young that the "problems we've had are the equivalent of being stalked, and our lawyer doesn't think it's funny" and that Mr. Bean "is a person to avoid. He announced that he was building his house in a way that allowed him to see over the hedge."  Id. at ¶ 36.  She also told Ms. Young that Mr. Bean had been stalking the Plaintiffs "for a long time" and that Mrs. Williams knew "hundreds of people and they will hear about his behavior."[9]  Id.

### c.  Mr. Bean and Ms. Black Attempt to Allay the Plaintiffs' Fears and Set the Record Straight

After hearing misinformation that had been circulating around the neighborhood, Mr. Bean made another effort to allay the Plaintiffs' fears and correct the record by e-mail dated March 8, 2016, which stated, in part:

Pardon this brief note of introduction.

First, I want to express that we look forward to being your neighbors on Water Street and hope to have a long and amicable acquaintance.  Please let me know if there is anything that we can do to be of support to you or assistance.  We have two sons who are always willing to help out.

Second, it has also been brought to our attention that a small, but vociferous, handful of neighbors have continued to relate misinformation about the planning and zoning approval process, and about us too.  Please know that this information is untrue, and personally motivated. . .

The plans for 28 Water Street were vetted and approved unanimously by town officials, and approximately 100 residents provided testimony and support in favor of the plans.  Only a handful spoke in opposition.

I want to make abundantly clear that at no stage did we ever make any comments with regard to you, nor would we have any reason to.  This information is simply false, unfortunate, and profoundly disappointing to hear.

---

[9] Discovery has revealed that the Plaintiffs have spread false statements about the Bean Family to dozens of individuals via e-mail correspondence.

We hope to be cordial neighbors. We would be delighted to welcome you for drinks, and to share common experiences as travelers and as an author. We possess only goodwill with regard to you. We sincerely hope that you will come to feel the same way.

Warm regards,
Randy Bean and Family. <u>SoF</u>, ¶ 37.[10]

Mrs. Williams responded to Mr. Bean's e-mail, telling him that she would be leaving Stonington "[a]s a consequence of your constantly forcing yourself in our lives." <u>SoF</u>, ¶ 38.[11]

### d. The Plaintiffs Continue to Make False Claims about the Bean Family

On April 5, 2016, Mrs. Williams sent an e-mail, entitled "Private Lives," to a group of twenty-seven individuals, including many neighbors, indicating that she and her husband were "watching out for 'Peeping Toms' and will take appropriate action." <u>SoF</u>, ¶ 41. This was at least the second time that the Plaintiffs had referred to "Peeping Toms" prior to any of the "spying" alleged in this lawsuit. Almost two months later, on May 26, 2016, Mrs. Williams sent another "Private Lives" e-mail to more individuals repeating the falsehood that Mr. Bean had said the house would be "so tall I will be able to look right into the Williams' garden." <u>Id.</u> at ¶ 42. She went on to claim that now that the Bean Residence was complete, "we can see the house was designed for spying in our direction: there are 19 south facing windows from which the peepers can watch our activities in our front garden and entrance, our kitchen entrance and grilling areas, and

---

[10] Understandably concerned with the tone of the accusations leveled against the Bean Family by the Plaintiffs at this time, Mr. Bean forwarded this e-mail to Captain Todd Olson of the Stonington Police Department to make him aware of the situation.
[11] Reba Williams testified at her deposition that Mr. Bean was begging people to bring him to the Plaintiffs' parties. <u>SoF</u>, ¶ 39. Other than inviting the Plaintiffs for drinks and asking the Plaintiffs' friends to broker a meeting to discuss the renovation of the Bean Residence, no member of the Bean Family ever sought to socialize with the Plaintiffs. <u>Id.</u> at ¶ 40.

our back porch and garden – but not the water."  Id.[12]  It should be noted that neither of

the Plaintiffs had been in the Beans' house after the renovation was completed and had

no idea what the Bean Family could see through their new windows.  Id. at ¶ 43.  Mrs.

Williams concluded by stating that the Plaintiffs were "doing all we can to protect our

privacy."  Id. at ¶ 42.  It appears that this included making false and fabricated claims to

neighbors and other members of the community about the Beans in an effort to justify

the "spying" claims which they eventually made in this lawsuit.[13]

The Beans' construction was completed around the beginning of June 2016 and

they received a Certificate of Occupancy from the Stonington Building Department in

early June 2016.  SoF, ¶ 44.  Although the Beans' permanent residence was in Boston,

they started using the house on Water Street on a part time basis after June 3, 2016.

Id. at ¶ 45.

One of the actions the Plaintiffs took purportedly to protect their privacy was to

install a "tree wall" on the property line between their property and the Beans' property.

The decision to install the "tree wall," the cost of which the Plaintiffs claim as damages

in this case, was made long before any allegations of "spying" or "surveillance" against

the Beans.  The Plaintiffs hired Matthew McMillan of Sam Bridge Nursery to design and

---

[12] As noted previously and as Mr. Tubridy indicated in his affidavit, there were perfectly legitimate and understandable reasons for the window placement at the Bean Residence, SoF, ¶ 15, namely, to take advantage of the incredible water views to the south.

[13] In addition, third-party discovery revealed that the Plaintiffs also engaged in a campaign to prevent the Bean Family from gaining information into the Plaintiffs' claims.  The Bean Family obtained correspondence from one subpoenaed witness, who received an e-mail from Mr. Williams after he was subpoenaed.  The e-mail requested that the recipients "refuse" any subpoena from counsel for the Bean Family.  E-mail dated December 19, 2016 (Exhibit 48).  Then, in late 2017, Mrs. Williams threatened one of the Bean Family's potential witnesses to an incident asserted in its Counterclaims, telling her that she should withdraw her statement or "I'll send a copy of your claim to everyone I know, with an attachment explaining who you are, and that you are trying to damage our reputation . . . [I]f you don't soon decide that you made a mistake, a very large number of people will soon learn how odd you are and how and what you try to do to people you'd never even met."  E-mail dated December 29, 2017 at p. 2. (Exhibit 49).

install what he called a privacy screen[14] on the Williams Property.  SoF, ¶ 46.  McMillan was first on the Williams' Property to look at it for purposes of designing and installing the screen during the first week of June 2016, several weeks before any of the alleged "spying" or "surveillance" occurred.  Id. at ¶ 47.

It is against this backdrop that the Plaintiffs' "spying" allegations must be understood.

### e.  The Alleged "Incidents" of "Spying" and "Surveillance"

The Plaintiffs' Complaint is dated August 31, 2016.  In it, they allege that Matthew or Christopher Bean "spied" on the Plaintiffs on three separate occasions while they were in the backyard of their property.

### 1.  The Alleged "Incident" on June 29, 2016

The first alleged "incident" of "spying" occurred on June 29, 2016.  SoF, ¶ 48.[15] The Plaintiffs claim that on this date, they were throwing a party in their backyard and either Christopher or Matthew Bean "glared directly and continuously" at the Williams Property, the Plaintiffs, and their guests.  Id.  Mrs. Williams testified either Matthew or Christopher Bean was irritating the guests at the party because he was sitting on the deck of the Beans' house.  Id.  Mr. Williams claimed Matthew or Christopher Bean was "intently looking at everything that was going on."  Id.  The Plaintiffs do not claim that either Matthew or Christopher Bean said anything to the Plaintiffs or their guests, but the Plaintiffs were merely upset that one of them was sitting on the deck and could see the party.  Id.

---

[14] The privacy screen is also referred to as a hedge.
[15] In the Complaint and the Plaintiffs' interrogatory responses, the date given for this "incident" was July 29, 2016.

Other than the Plaintiffs' claims, there is no evidence that this incident ever occurred. Matthew Bean was not present at the Bean Residence on June 29, 2016. SoF, ¶ 49. Christopher Bean denies that he "spied" on or "surveilled" the Plaintiffs on this date. Id. at ¶ 50. Mr. Williams listed several potential witnesses to the incident, including Mr. Hausman and a neighbor named Heidi Reavis. Id. at ¶ 51. Neither Mr. Hausman nor Ms. Reavis recalls any member of the Bean Family "spying" on or "surveilling" the Plaintiffs in any manner. Id. at ¶ 52;[16] and ¶ 53.[17] Mr. Williams indicated that Ms. Richards may have been present (Id. at ¶ 51), but Ms. Richards did not recall being there, and in any event, never witnessed any member of the Bean Family on the deck at the Beans' house when she was on the Williams Property. Id. at ¶ 54.

## 2. The Alleged "Incident" on July 8, 2016

On July 8, 2016, Mr. McMillan was at the Williams Property to do a site analysis and to speak with the Plaintiffs about the installation of the privacy screen. SoF, ¶ 55. The privacy screen consisted of the installation of numerous trees and hedges on the Williams Property bordering the Beans' property and running from the seawall on the Williams Property to Water Street. Id. Mr. Williams and Mr. McMillan testified that they were walking along the Williams Property and began to believe that someone was in the Bean's yard "shadowing" them. Id. Mr. Williams got up onto the seawall of the Williams Property and testified that either Matthew or Christopher Bean also climbed the seawall

---

[16] The Plaintiffs asked Mr. Hausman to speak with their private investigator in connection with this lawsuit. Ex. 7, ¶ 8. Mr. Hausman told the private investigator, *inter alia*, that he never witnessed any member of the Bean Family spy on or surveil the Plaintiffs. Id. After doing so, on October 20, 2016, Mr. Williams e-mailed Mr. Hausman and told him not to "write or call us or come anywhere near us again. We now know you are not a friend [.]" E-mail dated October 20, 2016 at p. 1 (Exhibit 50).
[17] Mr. Williams testified that he spoke to Mr. Hausman about the "incident" during the party. Ex. 9 at 66. Mr. Hausman never saw such an "incident." Ex. 7, ¶ 7.

13

on the Beans' property and began staring at him.  Id. [18]  Admittedly, the young man did not say a word to anyone on the Williams Property.  Id.  Christopher Bean denies that this occurred.  Id. at ¶ 56.  His brother, Matthew, was not at the Beans' property on this date.  Id. at ¶ 57.

Mr. Williams testified that later in the day, he saw Christopher Bean on the deck of the Bean Residence taking pictures.  SoF, ¶ 60.  This was at the same time that Mr. McMillan was in the Plaintiffs' backyard and was utilizing a stick to show "the height of four hornbeams" that he would be planting in this location.  Id.  Christopher Bean was at the Bean Residence on this date and saw the stick utilized by Mr. McMillan.  He took a picture of the stick and texted it to his mother.  Id. at ¶ 61.  The purpose of taking the photograph was to show his parents, who were not in Stonington at the time, how high the trees might be.  Mr. and Mrs. Bean were obviously interested in how high the trees would be, as it could directly affect their water views to the south.  Id. at ¶ 62.

### 3.  The Alleged "Incident" on July 20, 2016

The Plaintiffs claim that the final "incident" of "spying" occurred on or about July 20, 2016.  SoF, ¶ 63.  Mrs. Williams testified that she saw a person who she believed to be Christopher Bean pick up a ladder on the Bean Residence, climb it, and wave his arms around.  Id. at ¶ 64.  She claimed that this incident was witnessed by her gardener, Charles Brodasky.  Id. at ¶ 65.  Mr. Brodasky recalled being on the Williams Property on this date from before 8 a.m. until 4 p.m. to assist Mr. McMillan and his crew with the installation of the hedge.  Id. at ¶ 66.  Mr. Brodasky recalled that, at some point

---

[18] Reba Williams testified that Matthew or Christopher Bean was actually on the seawall of the Williams Property.  Ex. 14 at 223.  This is inaccurate and neither Mr. McMillan nor Mr. Williams agree with this.  No member of the Bean family has ever been on the Williams Property.  SoF, ¶ 58.  Moreover, prior to the date of this alleged incident, the Plaintiffs had erected wooden barriers on the seawall on either side of their property to prevent anyone on the wall from walking over the property lines.  Id. at ¶ 59.

during the day, someone appeared on the deck of the Beans' house but this individual was not doing anything.  Id. at ¶ 67.  He did not see either Matthew or Christopher Bean on a ladder on July 20, 2016.  Id.  When this occurred, Mrs. Williams began yelling to her husband but she did not say anything else.  Id. at ¶ 68.  Mr. Brodasky testified that Mrs. Williams never told him that she saw Christopher or Matthew Bean on a ladder.  Id. at ¶ 69.  Mr. Brodasky testified that he did not recall any incident in which someone from the Bean's property trespassed or spied on the Plaintiffs.  Id. at ¶ 70.  Mr. Brodasky spoke to the Plaintiffs' private investigator regarding this "incident."  Ex. 45 at 33.  He told the investigator exactly what he testified to at his deposition.  Id.  Subsequent to the meeting with the Plaintiffs' private investigator, Mr. Brodasky was advised by his employer that he was not to return to the Williams Property.  Id. at 45.

No member of the Bean Family was on a ladder on July 20, 2016 making any gestures at the Plaintiffs.  Id. at ¶ 71.

### f. The Beans Meet with the Stonington Police to Try and Resolve their Issues with the Plaintiffs, but the Plaintiffs Refuse

On August 3, 2016, the Plaintiffs had their counsel send correspondence to Mr. Bean regarding the Bean Family's alleged "spying" and "surveillance" activities.  Mr. Bean was concerned about the false allegations made against him and his family and immediately forwarded the letter to Captain Olson of the Stonington Police Department, requesting a meeting in the hopes of resolving the dispute.  SoF, ¶ 72.  The Plaintiffs also apparently reached out to Captain Olsen regarding the situation.  E-mails dated November 8 and 10, 2016 (Exhibit 47).  Captain Olson met with Ms. Black on August 5, 2016.  He explained the Plaintiffs' concerns to Ms. Black, and Ms. Black communicated

the Bean Family's concerns about the Plaintiffs.  <u>SoF</u>, ¶ 73.  Captain Olson attempted to meet with the Plaintiffs, but they ignored his repeated requests.  <u>Id.</u>

Thereafter, on November 8, 2016, Mrs. Williams sent an e-mail to Captain Olson.  <u>SoF</u>, ¶ 74.  She stated, *inter alia*: "When we recently had a problem we naturally turned to you.  We have been very disappointed.  Our problems have grown.  We think you could have solved them easily, as you had before."  <u>Id.</u>  Captain Olson responded the same day and stated as follows:

> Your husband did reach out to me concerning the current issue with your neighbors and I spent a significant amount of time communicating with the Beans and your husband.  I took the time to sit down with the Beans and try to express your concerns to them per your husbands [sic] request.  After determining their concerns I had every intention to sit down with you and your husband to figure out a solution to the problem.  I contacted your husband and advised him that I had spoken to the Beans but unfortunately he did not seem to be interested in getting together to discuss it further.  He thanked me for my assistance and explained that he was going to take civil action.  <u>Id.</u>

The Stonington Police Department took no criminal action in response to the Plaintiffs' unfounded allegations because no crimes had been committed, but did attempt to mediate the dispute.  However, the Plaintiffs' response was the same as it was when the Plaintiffs had a disagreement with the prior owner of 28 Water Street: they sued them.

## III.   LAW AND ARGUMENT

### a.  Motion for Summary Judgment Standard

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  <u>White v. ABCO Eng'g Corp.</u>, 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, the nonmoving party must

"set forth specific facts showing that there is a genuine issue for trial" and present such evidence as would allow a jury to find in his favor in order to defeat the motion.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Id.

Summary judgment is properly granted when no rational finder of fact could find in favor of the non-moving party.  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "The mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment."  Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam).  Similarly, the non-moving party may not rely on mere conclusory allegations or speculation, and must offer some hard evidence showing that its version of events is not wholly fanciful.  D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); see also Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) ("Nor may a party rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment") (citation omitted).  Only when reasonable persons, applying the proper legal standards, could differ in their responses to the question raised on the basis of the evidence presented should the question be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000); see also Zann Kwan v. Andalex Group, LLC, 737 F.3d 834, 843 (2d Cir. 2013) ("A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor") (citation omitted; internal quotation marks omitted).

### b. All Members of the Bean Family are Entitled to Summary Judgment on the Invasion of Privacy Claims

The Plaintiffs' first three cause of action are based on invasion of privacy claims and allege respectively: that Matthew and Christopher Bean invaded the Plaintiffs' privacy (First Cause of Action); that the Bean Family conspired to invade the Plaintiffs' privacy (Second Cause of Action); and that Mr. Bean and Ms. Black aided and abetted the invasion of the Plaintiffs' privacy allegedly committed by Matthew and Christopher Bean (Third Cause of Action).   None of these causes of action have any merit whatsoever and all members of the Bean Family are entitled to summary judgment on all three causes of action.

### 1. Matthew and Christopher Bean did not Invade the Plaintiffs' Privacy

Invasion of privacy is comprised of several different torts.  "[T]he law of privacy has not developed as a single tort, but as a complex of four distinct kinds of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff to be let alone."  Foncello v. Amorossi, 284 Conn. 225, 234 (2007).  The Connecticut Supreme Court has described the four types of invasion of privacy: (1) appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's physical solitude or seclusion; (3) publicity, of a highly objectionable kind, given to private information about the plaintiff even though it is true and no action would lie for defamation; and (4) publicity which places the plaintiff in a false light in the public eye.  (Internal quotation marks omitted.) Honan v. Dimyan, 52 Conn. App. 123, 131, cert. denied, 249 Conn. 909 (1999) (quoting

Ventura v. Savitt, Inc., 191 Conn. 588, 591 n.1 (1983)).  The Complaint does not allege that Matthew and Christopher gave publicity to matters that placed the Plaintiffs in a false light before the public.  The remaining three torts: giving unreasonable publicity to another's private life; unreasonably intruding upon the seclusion of another; and appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness, are discussed in turn.

A.    **Matthew and Christopher Bean did not Give Unreasonable Publicity to the Plaintiffs' Private Lives**

In paragraph 35 of the Complaint, the Plaintiffs allege that Matthew "and/or" Christopher Bean "circulated, disseminated, transferred, disclosed, and/or otherwise publicized photographs, audio recordings and/or digital/video recordings of the Williams to third-party(ies)."  In Perkins v. Freedom of Info. Comm'n, 228 Conn. 158, 170-72 (1993), the Connecticut Supreme Court approved the Restatement's definition of the cause of action for giving unreasonable publicity to another's private life.  Under Section 652D, in order to successfully litigate a cause of action for giving unreasonable publicity to the plaintiff's private life, the plaintiff must plead and prove: (1) that the defendant gave publicity; (2) to a matter concerning the private life of the plaintiff; and (3) that the matter publicized was of a kind that: (a) would be highly offensive to a reasonable person, and (b) is not of a legitimate concern to the public."  Restatement (Second) Torts § 652D (1971).  See also Perkins, 228 Conn. at 172.

i.    **There was no "Publicity" of any Matter**

A defendant will only be held liable for invasion of privacy if he "gives publicity" to facts concerning the private life of the plaintiff.  Restatement (Second) Torts § 652D,

comment (a) (1971).  Under the Restatement, "publicity" differs from "publication," which includes any communication by the defendant to a third person.  Id.  "Publicity," on the other hand, "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . Thus, it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons."  Id.

Christopher and Matthew Bean did not communicate with anyone outside of their family regarding the Plaintiffs or their property.  SoF, ¶ 75.  Communication to such a limited number of people has been found not to constitute an invasion of privacy.  See Blue v. Carbonaro, No. CV146015705S, Judicial District of Ansonia-Milford, 2015 WL 3555294, *9 (Iannotti, J., May 11, 2015) (collecting cases on publicity)[19]; Bremmer-McClain v. New London, No. CV115014142S, Judicial District of New London, 2012 WL 2477921, *15 (Devine, J., Jun. 1, 2012) (not an invasion of privacy to communicate a fact concerning the plaintiff's private life to small group of persons); Grigorenko v. Pauls, 297 F. Supp. 2d 446, 448-49 (D. Conn. 2003) (communication to nine people at Yale and three people outside of Yale does not constitute public disclosure); Allen v. Verizon Wireless, No. 3:12-cv-482 (JCH), 2013 WL 2467923, *8-9 (D. Conn., Hall, J., Jun. 6, 2013) (disclosure of private health information to two entities related to plaintiff's application for FMLA benefits does not constitute public disclosure); Handler v. Arends, No. 0527732 S, Judicial District of Hartford/New Britain at Hartford, 1995 WL 107328 (Sheldon, J., Mar. 1, 1995) (granting summary judgment for reading a memorandum to a committee of ten persons); and Balzac v. Stamford Hosp., No. CV 950143645S, 1996

---

[19] All unreported cases are attached as Exhibit 51.

WL 222406 (Tobin, J., Apr. 2, 1996) (statements disclosing personal information made to several people in a waiting room not an invasion of privacy).

In <u>Grigorenko v. Pauls</u>, Judge Chatigny granted a motion to dismiss a claim brought by a university professor against two former colleagues who allegedly disclosed, or caused to be disclosed, allegations of plagiarism by the plaintiff to nine persons at Yale University and three other individuals.  297 F. Supp. 2d at 448. Applying Connecticut law, the court held that "such limited disclosure falls well short of publicizing the allegations in such a manner and to such an extent as to make it substantially certain that they will become public knowledge." <u>Id.</u> at 448-49.

The same is true for the disclosures alleged in this case. They were limited to the members of the Bean Family and were intended to be and remain private. They were not publicized in a manner and to such an extent as to make it substantially certain that they would become public knowledge. Therefore, Matthew and Christopher are entitled to summary judgment to the extent the Plaintiffs are seeking recovery for the tort of giving unreasonable publicity to one's private life.

ii.     **The Defendants Did Not Give Publicity to a Matter Concerning the Private Life of the Plaintiffs**

Even if the Court were to find that Matthew or Christopher Bean gave publicity to facts concerning the Plaintiffs, the facts did not concern the Plaintiffs' private life. Liability for giving publicity to the private life of another "applies only to publicity given to matters concerning the private, as distinguished from the public, life of the individual. There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public."  Restatement (Second) Torts § 652D, comment

(b) (1971).  Thus, there is no liability for giving publicity to facts about the plaintiff that are matters of public record and/or open to inspection by the public.  Id.

The only facts the Plaintiffs' claim were publicized involved the planning and installation of the tree wall and photographs of the same. This took place in the Plaintiffs' backyard in plain sight of the Bean Property and neighbors to the north and south, as well as anyone in Stonington Harbor to the west.  See Photograph of Water Street from the West (Exhibit 52). Communications or photographs concerning the planning and installation of the tree wall were not private facts.

### iii.    There was no Publicity that Would be Highly Offensive to a Reasonable Person

Moreover, even if the Court were to find that Matthew and Christopher Bean gave publicity to facts concerning the Plaintiffs' private life, nothing that was communicated can, as a matter of law, be considered highly offensive to a reasonable person.  Comment (c) to Section 652D of the Restatement (Second) of Torts provides details about the kind of publicity that is actionable.  In relevant part, it provides:

> The rule stated in this Section gives protection only against *unreasonable publicity*, of a kind highly offensive to a reasonable man . . .The ordinary reasonable man does not take offense at a report in a newspaper that he has returned from a visit, gone camping in the woods or given a party at his house for his friends.  Even minor and moderate annoyance, as for example through public disclosure of the fact that the plaintiff has clumsily fallen downstairs and broken his ankle, is not sufficient to give him a cause of action under the rule stated in this Section.  It is only when the publicity given to him is such that a reasonable person would feel justified in feeling seriously aggrieved by it, that the cause of action arises."  (Emphasis added).

The Restatement recognizes that complete privacy does not exist in this world, and thus, that the ordinary and reasonable man must "expect the more or less casual observations of his neighbor as to what he does . . ." Id.

22

The Connecticut Supreme Court has "listed the following as examples of personal and private information that are given protection: sexual relations; family quarrels; many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters; most details of a man's life in his home; and some of his past history that he would rather forget." Graff v. O'Connell, No. CV010095518S, Judicial District of Middlesex, 2002 WL 450534, *5 (Shapiro, J., Mar. 5, 2002) (citing Perkins, 228 Conn. at 172-73).

Matthew and Christopher Bean have not taken any action to disclose any protected information as articulated by the Connecticut courts.  They did not publicize the Plaintiffs' sexual relations, any of the Plaintiffs' disputes, any actual or perceived illness of the Plaintiffs, any of the Plaintiffs' correspondence, any of the Plaintiffs' activities inside their home, or any of the Plaintiffs' past history.  All the Plaintiffs can show is that in July 2016 Christopher Bean took several photographs with his cell phone from the Bean Residence of the planning and installation of the tree wall on Plaintiffs' property and sent a few text messages about the activity to his parents who were not in Stonington at the time.  The Bean Family was understandably interested in the Plaintiffs' installation of the tree wall at the Williams Property, as it could significantly affect their magnificent water views to the south, and adversely affect the value and ability to sell their property.  In short, the Bean Family had no interest in the Plaintiffs' yard, their gardens, or what the Plaintiffs were doing in their yard.  Their concern was to determine whether the spite wall that was being installed would affect their views and property value.  SoF, ¶ 62.  No reasonable person would consider these private communications among the members of a family, which had recently purchased and expended

significant funds to renovate their home mainly due to its proximity to and views of such a natural resource as the Long Island Sound, to be offensive at all.

Moreover, the holding in <u>Graff</u> compels summary judgment in favor of Matthew and Christopher Bean.  In <u>Graff</u>, the plaintiffs alleged, *inter alia*, that the defendants videotaped the plaintiffs and their property and showed those videotapes to third parties.  2002 WL 450534 at *1.  In granting a motion to strike on the ground that the plaintiffs did not plead any facts supporting the claim that the defendants gave publicity to private facts, Judge Shapiro found that "[t]he plaintiffs have not alleged the videotaping of any of the aforementioned enumerated examples of protected, personal and private information.  For example, the plaintiffs have alleged the 'videotaping of the plaintiffs and their property,' but have not alleged that the defendants videotaped any details of the plaintiffs' lives *in* their home, as specified on the list of protected information."  <u>Id.</u> at * 6 (emphasis original).  The same is true in this case. The Plaintiffs have not alleged and there is no evidence that Matthew or Christopher Bean publicized any protected conduct of the Plaintiffs.  "Therefore, the defendants' alleged conduct cannot be considered highly offensive to a reasonable person."  <u>Id.</u>

With respect to the purported July 8, 2016 "incident," even assuming that Christopher Bean did overhear the conversation between the Plaintiffs and Mr. McMillan, that conversation took place in the backyard of the Williams Property, and there is nothing prohibiting Christopher Bean from being in his own backyard and observing with his own senses whatever could be observed from there.  The Plaintiffs made no effort to keep their discussions or activities private and communications and actions taken during the planning and installation of a hedge which is in plain view of

several neighbors is not a private matter that is protected by law.

The June 29, 2016 "incident" allegedly involved either Matthew or Christopher Bean sitting on their deck while a party was occurring in the backyard of the Williams Property. The Plaintiffs do not claim and there is no evidence that any protected information of the Plaintiffs was obtained or disclosed on this occasion. The same can be said for the July 20, 2016 "incident" in which the Plaintiffs' claim merely that either Matthew or Christopher Bean was sitting on the deck at the Bean Residence.

Matthew and Christopher Bean did not give unreasonable publicity to the private life of the Plaintiffs of a kind that would be highly offensive to a reasonable person and therefore are entitled to summary judgment on the First Cause of Action to the extent that it attempts to set forth a claim of publicity of the Plaintiffs' private lives.

> **B.** **Matthew and Christopher Bean did not Unreasonably Intrude upon the Plaintiffs' Seclusion**

In paragraph 33 of the Complaint, the Plaintiffs allege that Matthew "and/or" Christopher Bean "have intentionally and unreasonably interfered with, invaded and intruded on the Williams' rights to solitude, seclusion, in privacy in their home and on their property." The Connecticut appellate courts have not yet set forth the necessary elements of a claim for unreasonable intrusion upon seclusion. Carney v. Amendola, No. CV106003738, Judicial District of Ansonia-Milford, 2014 WL 2853836, *17 (Brazzel-Massaro, J., May 14, 2014). The trial courts in Connecticut generally rely on § 652B of the Restatement (Second) of Torts and the comments and cases citing those sections. Id. An unreasonable intrusion upon the seclusion of another "consists solely of an intentional interference with [the plaintiff's] interest in solitude or seclusion, either as to

his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man."   Id. (citing Restatement (Second) of Torts, § 652B, comment (a) (1971)).   "The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home.  It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his phone wires."   Id. (citing Restatement (Second) of Torts, § 652B, comment (b) (1971)).

Comment (c) to the Restatement (Second) of Torts, § 652B provides, in pertinent part: "The defendant is subject to liability under the rule stated in the Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs . . ."

"[T]he mere presence of an allegation of physical entry into the private areas of the plaintiff does not automatically state a viable claim for invasion of privacy based upon that seclusion category."  Cavallaro v. Rosado, No. CV054009939, Judicial District of New Haven, 2006 WL 2949143, *5 (Robinson, J., Oct. 5, 2006).  "To successfully state an unreasonable intrusion, plaintiffs must prove an intentional physical intrusion [by the defendant] upon the private affairs or concerns of the plaintiffs which would be highly offensive to a reasonable person."   Id. (citing Tapia v. Sikorsky Aircraft Div. of United Techs. Corp., No. CV95327761, 1998 WL 310872 (Stodolink, J., May 28, 1998); and Mastroberti v. Hall, No. 058336, Judicial District of Litchfield, 1993 WL 58277 (Pickett, J., Feb. 18, 1993)).  In Mastroberti v. Hall, the court concluded that assertions

26

that the defendant trespassed on the business property of the plaintiff, photographed from the trespassed areas, and illegally obtained statements of the plaintiff's financial finances were insufficient to support the plaintiff's intrusion upon privacy claims. 1993 WL 58277 at *3.

In Parnoff v. Aquarion Co., No. FBTCV146045191S, 2015 WL 7061748 (Arnold, J., Oct. 20, 2015), the court granted a motion to strike an intrusion upon seclusion claim against the Town of Stratford and one of its police officers, who was called to the plaintiff's property by water company employees who went onto the property to inspect a fire hydrant. Id. at *2. The plaintiff told the water company employees to get off his property and they allegedly accused him of stealing water. Id. After a verbal altercation between the plaintiff and the water company employees, they both called the police to the scene. Id. The plaintiff later sued the Town, the police officer, the water company and three of its employees. In granting a motion to strike filed by the Town and police officer, the court noted that the events alleged:

> all took place at the plaintiff's property, but they were outside of the home and occurred in the outdoor yard area. The actions of the defendants did not compromise any private information or the general privacy of the plaintiff . . . The court does not doubt that the results of the police officer's arrival at the scene, and his discretionary acts in arresting and handcuffing the plaintiff may have been embarrassing and may have caused the plaintiff emotional distress. However, the actions of officer McGlynn as alleged in the complaint are not highly offensive to a reasonable person. Id. at *9.

Approximately a year later, in the same case, the court granted summary judgment in favor of all of the defendants on claims for intrusion upon seclusion. Parnoff v. Aquarion Water Company of Conn., No. CV14604519 2017 WL 659402 (Radcliffe, J., Jan. 5, 2017). In granting summary judgment, the court noted that the entry onto plaintiff's property "was confined to the driveway area" and the defendants

27

never entered the residence or a closed garage.  Id. at *6.  The open canopy where a fire hydrant cap was found was exposed to public view, and entry into it was made solely for the purpose of discovering the missing hydrant cap.  Id.  The court concluded that the claim that the defendant unreasonably intruded upon plaintiff's seclusion was utterly unsupported by the facts.  Id.  See also Webb v. CBS Broadcasting, Inc., No. 08 C 6241, 2011 WL 4062488 (N.D. Ill., Sept. 13, 2011) (St. Eve, J.) (granting summary judgment to CBS after reporter videotaped events in the backyard and pool of plaintiff's brother's residence because it was in plain view from an adjoining open, grassy area even though the pool was surrounded by a fence).

Here, neither Matthew not Christopher Bean went on the Plaintiffs' property, entered their home, looked into their house or tapped their phone wires.  Nor did they ever use their senses to oversee or overhear the Plaintiffs' private affairs.  The Plaintiffs claim there was an intrusion upon their seclusion when: (1) Christopher Bean was sitting on the deck at the Bean Residence, purportedly staring at the Plaintiffs, who were on their property; and (2) during the July 8, 2016 "incident" when either Matthew or Christopher Bean allegedly was on the Bean Residence and listening to a conversation that the Plaintiffs were having with Mr. McMillan regarding the installation of the hedge. A determination of whether Matthew or Christopher Bean intruded upon the Plaintiffs' seclusion requires the Court to first consider whether the Plaintiffs had a reasonable expectation of privacy in their backyard, which, as the Plaintiffs admit, was plainly visible from and within listening distance to the deck of the Bean Residence.  See e.g. Gullong v. Nurmi, No. CV156013784, Judicial District of Middletown, 2016 WL 7165014, *3 (Vitale, J., Nov. 8, 2016) (In considering a claim of intrusion upon the seclusion of

28

another, "[c]ases addressing the fourth amendment may be instructive in determining whether there is a reasonable expectation of privacy in a particular area").

Fourth Amendment decisions discussing reasonable expectations of privacy in connection with the application of the plain view doctrine are instructive here.  The plain view exception applies when police have a warrant, or one of the recognized exceptions to the warrant requirement, "to search a given area for unspecified objects, and in the course of the search come across some other article of incriminating character."  Horton v. California, 496 U.S. 128, 135 (1990).  "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy."  Id. at 133 (citing Arizona v. Hicks, 480 U.S. 321, 325 (1987); and Illinois v. Andreas, 463 U.S. 765, 771 (1983)).

In addition, the Fourth Amendment cases related to aerial surveillance are also instructive.  In California v. Ciraolo, 476 U.S. 207 (1986), police, acting on a tip, flew in an aircraft at 1,000 feet over a house and observed with the naked eye marijuana growing in the yard.  The Court held that although the yard was within the curtilage of the house, that a fence shielded the yard from observation from the street, and the occupant had a subjective expectation of privacy, there was no reasonable expectation of privacy.  Id. at 214.  The Court found that "[t]he Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye."  Id. at 215.  A few years later, in Florida v. Riley, 488 U.S. 445 (1989), the Supreme Court held that overhead surveillance of a partially covered greenhouse in a residential backyard from a helicopter located 400 feet above the greenhouse did not constitute a search for

purposes of the Fourth Amendment since there was no reasonable expectation of privacy because, although the defendant had taken precautions to prevent observation from ground-level, "what was growing in the greenhouse was subject to viewing from the air." Id. at 448, 450.  See also Kaminsky v. Mattson, 300 F. Supp. 3d 397 (D. Conn. 2018), appeal filed, Kaminsky v. Schriro, No. 18-403 (2d Cir.) (no reasonable expectation of privacy in an area of a backyard bordered by a lake which was freely observable from the lake).  These two lines of United States Supreme Court cases hold that what can be observed in plain view or overhead by someone with a right to be in a given location is not subject to a reasonable expectation of privacy.  In this case, the Plaintiffs are trying to hold the Bean Family liable for an intrusion into their seclusion even though they claim that their backyard is visible and within earshot of the deck at the Bean Residence.[20]  What the Plaintiffs are really saying is that the Bean Family and their guests are unable to use their deck whenever the Plaintiffs are in their backyard because the Plaintiffs may be seen or heard from that deck.  Although the Bean Family has absolutely no intention of watching the Plaintiffs in their backyard or listening to what they are saying there, the Bean Family has every right to be on their deck and in their own yard to observe with their senses whatever can be observed from there.

Moreover, as the designer of the renovation of the Bean Residence, Kevin Tubridy, has indicated, there was nothing sinister about the renovation, which was specifically designed to take advantage of solar gain and to provide sweeping views of Fishers Island, Fishers Island Sound, and Montauk Point.  Affidavit of Kevin Tubridy, ¶¶ 5 and 6 (Exhibit 11).  Moreover, Mr. Bean and Ms. Black filed an application with the

---

[20] The yard and what is said there can also be seen and heard from the property to the Plaintiffs' south and from the water.

Borough of Stonington Planning & Zoning Commission to renovate the Bean Residence and the Plaintiffs did not oppose it.  The application passed unanimously.  The Plaintiffs should not now be allowed to use this Court to prevent the Bean Family from the lawful use and enjoyment of their own property simply because the Plaintiffs live next door.

Similarly, the Plaintiffs did not have any reasonable expectation of privacy during the July 8, 2016 "incident" in which Christopher Bean, who was at the Bean Property, allegedly listened to the Plaintiffs' conversation with Mr. McMillan on the Williams Property.[21]  The Connecticut Supreme Court has held that "[c]onversations carried on in any type of residence, or anywhere for that matter, in a tone audible to the unaided ear of a person located in a place where that person has a right to be, and where a person can be expected to be, are conversations knowingly exposed to the public."  State v. Benton, 206 Conn. 90, 96 (1988).

In Benton, the Connecticut Supreme Court held that a police detective who was investigating the defendant and overhead the defendant's conversations from an adjacent apartment, where he was with the permission of the tenant of that apartment, and who did not employ any electronic aids or sensory enhancing devices, did not violate the defendant's Fourth Amendment rights.  Id. at 94.  The Court noted that "[o]ne who is insensitive to his surroundings and indiscriminate in his conversation bears the risk of being overheard by an eavesdropper," that eavesdropping "is the kind of risk we necessarily assume whenever we speak," and that "[e]avesdropping from a place where [an] officer has a right to be is a long-accepted technique of crime detection, not outlawed by the Fourth Amendment.  If [the defendant] had talked loud enough to be

---

[21] As stated previously, Christopher Bean denies the allegations of the July 8, 2016 "incident."  See supra, p. 14.  However, assuming for the sake of argument that he did do what is alleged, it is not actionable as an intrusion upon the Plaintiffs' seclusion.

overheard his expectation of privacy would be gone." Id. at 97.

The Plaintiffs do not claim, because they cannot, that Christopher Bean did not have a right to be at the Bean Property.  Nor do they claim that he used any sort of a listening device.  Hence, the Plaintiffs had no expectation of privacy in what could be seen from the Bean Property or their conversation with Mr. McMillan and cannot establish that Christopher Bean (or any member of the Bean Family) intruded upon the seclusion of the Plaintiffs.  Accordingly, Matthew and Christopher Bean are entitled to summary judgment with respect to the claim that they intruded upon the seclusion of the Plaintiffs.

### C. Christopher and Matthew Bean Did Not Appropriate, For Their Benefit or Advantage, the Plaintiffs' Name or Likeness

In paragraph 39 of the Complaint, the Plaintiffs allege that Christopher "and/or" Matthew Bean have appropriated the names and/or likenesses of the Williams for their own purposes and/or benefit. Although the Connecticut Supreme Court has recognized this tort's existence under the law of Connecticut, Venturi v. Savitt, Inc., 191 Conn. 588, 592 (1983), there is no evidence that Christopher or Matthew Bean appropriated the Williams likenesses or names for any purpose whatsoever.   Accordingly, they are entitled to judgment as a matter of law to the extent the Complaint attempts to state a cause of action for the tort of appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness.

### 2. The Bean Family Did Not Conspire to Invade the Plaintiffs' Privacy

In the Second Cause of Action alleged in the Complaint, the Plaintiffs claim that the Bean Family conspired to invade the Plaintiffs' privacy.  "The [elements] of a civil

action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the Plaintiff."  Macomber v. Travelers Prop. & Cas. Corp., 277 Conn. 617, 635-36 (2006).  "Under Connecticut law, technically speaking, there is no such thing as a civil action for conspiracy.  The action is for damages committed pursuant to a formed conspiracy rather than by the conspiracy itself.  A claim for civil conspiracy, therefore, is insufficient unless based on some underlying cause of action.  Consequently, for a plaintiff to recover on a conspiracy claim, the court must find the facts necessary to satisfy the elements of an underlying cause of action."  Litchfield Asset Mgmt. Corp. v. Howell, 70 Conn. App. 133, 140 (2002) (internal citations and quotations omitted).

As set forth in the preceding sections, the Plaintiffs cannot establish that Matthew and Christopher Bean invaded the Plaintiffs' privacy.  Since the Plaintiffs cannot prove the underlying torts, there can be no civil conspiracy, and the Bean Family is entitled to summary judgment on the Second Cause of Action.

### 3. Mr. Bean and Ms. Black Did Not Aid and Abet the Invasion of the Plaintiffs' Privacy

In the Third Cause of Action alleged in the Complaint, the Plaintiffs claim that Mr. Bean and Ms. Black aided and abetted the tort of invasion of privacy.  "'For harm resulting to a third person from the tortious conduct of another, a person is liable if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'  Restatement 4 Torts, 876.  If the encouragement or assistance is a substantial factor in causing the resulting

tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."   Barrett v. Tirella, No. AANCV054003673, Judicial District of Ansonia-Milford, 2007 WL 706814, *4 (Esposito, J., Feb. 20, 2007) (quoting Carney v. DeWees, 136 Conn. 256, 262 (1949)).

Here, the undisputed evidence shows that the only actions Mr. Bean and Ms. Black took regarding the "spying" purportedly committed by their sons was to ask Christopher Bean to document via photograph the proposed height, planning and installation of the hedge in July 2016.  As has been discussed in the preceding sections, this is not an invasion of privacy.  Therefore, because there is no underlying tort, there can be no aiding and abetting, and Mr. Bean and Ms. Black are entitled to summary judgment on Third Cause of Action.

### c. The Bean Family did not Negligently Inflict Emotional Distress on the Plaintiffs

In the Fourth Cause of Action alleged in the Complaint, the Plaintiffs allege that Matthew "and/or" Christopher Bean's purported "spying" and "surveillance" activities negligently inflicted emotional distress on the Plaintiffs.  In the Fifth Cause of Action, the Plaintiffs allege that Mr. Bean and Ms. Black aided and abetted the negligent infliction of emotional distress committed by Matthew "and/or" Christopher.  As set forth below, the Plaintiffs' claim as to Matthew and Christopher Bean fails, and therefore, the aiding and abetting claim against Mr. Bean and Ms. Black must also fail.

### 1. Matthew and Christopher Bean did not Negligently Inflict Emotional Distress on the Plaintiffs

To prevail on a claim of negligent infliction of emotional distress, "the plaintiff must prove: 1) the defendant's conduct created an unreasonable risk of causing the

plaintiff emotional distress; 2) the plaintiff's distress was foreseeable; 3) the emotional distress was severe enough that it might result in illness or bodily harm; and 4) the defendant's conduct was the cause of the plaintiff's distress."  Grasso v. Conn. Hospice, Inc., 138 Conn. App. 759, 771 (2012).  "The plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm."  McNamara v. Tournament Players Club of Conn., Inc., 270 Conn. 179, 197 (2004).

The issue of whether the alleged conduct of Matthew and/or Christopher Bean was severe enough that it might result in illness or bodily harm can be decided in their favor as a matter of law.  In Micek-Holt v. Papageorge, 180 Conn. App. 540 (2018), the Connecticut Appellate Court affirmed a trial court decision granting summary judgment in favor of a defendant on a negligent infliction of emotional distress claim.  The facts are nearly identical to this case.  In Micek-Holt, the conduct claimed to have inflicted emotional distress was as follows: (1) Ms. Micek-Holt took photographs on more than one occasion of the plaintiff's decedent's home from a neighbor's property; and (2) Ms. Micek-Holt told a visitor of the plaintiff's decedent that her hostess was not paying rent and had given her "the finger."  Id. at 570.  The court held that it was hard to conceive that the plaintiff's decedent "would suffer illness or bodily harm as a result of Ms. Micek-Hold's minor incivilities."  Id. at 571.

Here, the only conduct at issue are various incidents where the Plaintiffs claim either Matthew or Christopher Bean was sitting on the deck at the Bean Residence staring in the direction of the Plaintiffs while they were in their backyard; the instance on

July 8, 2016 when Christopher Bean photographed the expected height of the spite wall; the alleged instance on July 20, 2016 where Matthew or Christopher Bean climbed a ladder on the Bean Property and waved their arms at Mrs. Williams (which Matthew Bean, Christopher Bean, and Mr. Brodasky all deny occurred); and the one occasion where either Matthew or Christopher Bean was on the Bean Property and was allegedly able to hear a discussion about the installation of a hedge. None of these actions amount to conduct that might cause injury or bodily harm to the Plaintiffs.

Furthermore, even if the Court were to find an issue of fact with respect to Matthew or Christopher Bean's alleged causing injury or bodily harm to the Plaintiffs, the Plaintiffs' alleged "emotional distress" damages are insufficient as a matter of law. In Capasso v. Christmann, No. CV095031331S, Judicial District of New Haven, 2016 WL 7975806 (Frechette, J., Dec. 12, 2016), the court granted the defendants' motion for summary judgment on the ground that the plaintiffs[22] were unable to demonstrate, *inter alia*, that their alleged emotional distress was severe enough that it might result in illness or bodily harm. Id. at *11. The individual plaintiff testified that his emotional distress damages included difficulty sleeping, loss of sleep, and hurt feelings, but never informed his doctors of his sleep problems. Id. at *10.

The same result is warranted here. Mr. Williams testified that he was "considerably bothered" by being stared at because either Matthew or Christopher Bean did not avert their eyes when, while at the Bean Residence, one of them saw Mr. Williams at the Williams Property. SoF, ¶ 76. He testified that this distracted him from marketing a book that he had written. Mr. Williams testified that his wife's emotional

---

[22] One plaintiff was an individual and the other a corporation.

distress consisted of being uncertain about whether to move.[23]  Id.  Mrs. Williams only claims that she suffered "garden variety" emotional distress.  Id. at ¶ 78.  Thus, the alleged emotional distress suffered by the Plaintiffs in this case is even less than in Capasso, where Judge Frechette found that the individual plaintiff's emotional distress damages were insufficient where he suffered a loss of sleep, diminished sleep, and hurt feelings.  All the Plaintiffs here can claim is that Mr. Williams became distracted from marketing a book, and Mrs. Williams has not made any specific claims of emotional distress.

### 2. Mr. Bean and Ms. Black did not Aid and Abet the Negligent Infliction of Emotional Distress on the Plaintiffs.

In the Fifth Cause of Action, the Plaintiffs allege that Mr. Bean and Ms. Black aided and abetted one of their sons in committing the tort of negligent infliction of emotional distress.  As discussed in the section above, Matthew and Christopher Bean are entitled to summary judgment on the underlying negligent infliction of emotional distress claim.  Because there is no underlying tort, the Plaintiffs cannot maintain this cause of action and summary judgment is appropriate on the Fifth Cause of Action. See supra, p. 33-34.

### d. The Plaintiffs are not Entitled to Injunctive Relief

Finally, in the Sixth Cause of Action alleged in the Complaint, the Plaintiffs seek a permanent injunction against the Bean Family.  The Plaintiffs claim that they are entitled to an injunction preventing the Bean Family from: (1) spying or surveilling the Plaintiffs or those on the Williams Property; (2) disseminating any images, recordings, or

---

[23] Significantly, the Plaintiffs did not move and still own the house to this very date.  They have lived in the house, as is their custom, at various times during the summer months.  SoF, ¶ 77.  Mrs. Williams "uncertainty" about whether to move was apparently resolved in the negative.  Clearly, her alleged distress was not severe.

photographs of the Plaintiffs or those on the Williams Property; (3) contacting, communicating with, or otherwise "harassing" the Plaintiffs; (4) interfering with and/or invading the Plaintiffs' rights of privacy on the Williams Property; (5) disseminating any false statements regarding the Plaintiffs to third-parties; and (6) assisting anyone who takes the foregoing actions.  Complaint, Sixth Count, ¶ 81.  The evidence establishes that the Plaintiffs are not entitled to a permanent injunction as a matter of law.

A plaintiff seeking a permanent injunction in a private enforcement action such as this must establish "(1) that injury from failure to grant an injunction is imminent; (2) the injury is substantial; (3) the injury is irreparable and there is a substantial probability that unless an injunction is issued the party seeking it will suffer irreparable harm."  Steroco, Inc. v. Szymanski, 166 Conn. App. 75, 89 (2016).   In addition, the Plaintiffs must establish that they have no adequate remedy at law and the balance of equities tips in their favor.  Aqleh v. Cadlerock Joint Venture II, L.P., 299 Conn. 84, 97 (2010).

Simply put, there is nothing here for the Court to enjoin.  The Bean Family has never spied on or otherwise surveilled the Plaintiffs.  They have never disseminated any information about the Plaintiffs outside of their family.  The only allegedly "harassing" conduct at issue in this case is the Bean Family's use of their deck, which the Plaintiffs consider to be "spying" because they believe that the Bean Family can see and hear the Plaintiffs from their deck. Furthermore, the Bean Family has made no false statements about the Plaintiffs, and have not aided or abetted anyone from taking any of the enumerated actions set forth in Paragraph 81 of the Complaint.  Accordingly, there is no reason for this Court to issue an injunction.

Moreover, the balance of equities favors the Bean Family and does not support the enforcement of a permanent injunction.  The Plaintiffs are essentially trying to prevent the Bean Family from exercising one of the most fundamental constitutional rights: the right to the lawful use and enjoyment of their own private property.

Finally, the Plaintiffs have an adequate remedy at law and have decided not to exercise it.  If they were so concerned about the renovation of the Bean Residence, they could have opposed it to the Borough of Stonington Planning and Zoning Commission or joined the lawsuit brought by several neighbors after the application was approved.  If they did either, they could have raised any concerns about the height of the deck at the Bean Residence or the south-facing windows.  They are now, after the renovation has been completed, seeking to prevent the Bean Family from their right to use and enjoy their property and the Bean Family respectfully contends that this Court should not permit it.  Additionally, because there is no allegation of any "spying" or "surveillance" by the Beans on any occasion subsequent to July 20, 2016, this lawsuit, which seeks damages related to those alleged incidents, is an adequate remedy at law. The Plaintiffs appear to be using this lawsuit to enjoin alleged activities by the Bean Family even though nothing has occurred in two years.

**IV.    CONCLUSION**

The Plaintiffs have spent more than two years calling the Bean Family "peeping toms" and degrading the good name of the Bean Family in the Stonington community simply because the Bean Family had the gall to buy a house next to the Plaintiffs, renovate the house, and use and enjoy their new renovation in accordance with the law. The Bean Family wants nothing more than to be left alone while they enjoy the fruits of

their labor.  They have every right to be on their property, to use their property for any

lawful purpose, and to see and hear whatever can be seen and heard from it.  As no

member of the Bean Family has ever spied on or conducted surveillance of the

Plaintiffs, or negligently inflicted emotional distress upon the Plaintiffs, the Bean Family

respectfully requests that their Motion for Summary Judgment be granted.

THE DEFENDANTS,
RANDALL BEAN, ELIZABETH BLACK,
CHRISTOPHER BEAN, AND MATTHEW
BEAN

By:_____/s/_____
Michael T. Ryan, Esq. (ct 05685)
Michael C. Barbarula, Esq. (ct29454)
Ryan Ryan Deluca LLP
707 Summer Street
Stamford, CT 06901
Phone:  203-357-9200
Fax: 203-357-7915
mtryan@ryandelucalaw.com
mcbarbarula@ryandelucalaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, a copy of the foregoing was filed
electronically and served by mail on anyone unable to accept electronic filing.  Notice of
this filing will be sent by e-mail to all parties by operation of the Court's electronic filing
system or by mail to anyone unable to accept electronic filing as indicated on the Notice
of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael C. Barbarula, Esq.*_____
Michael C. Barbarula, Esq.